ARTHUR BRONSON, COMPLAINANT, *v.* JOHN H. KINZIE AND JULIETTE A., HIS WIFE, EDMUND K. BUSSING AND JOHN S. BUSSING, THE PRESIDENT, DIRECTORS, AND COMPANY OF THE STATE BANK OF ILLINOIS, JAY HATHWAY, MARY ANN WOLCOTT, DANIEL S. GRISWOLD, CAROLINE DUNHAM, AND ALONZO HUNTINGTON, DEFENDANTS.

A state law, passed subsequently to the execution of a mortgage, which declares that the equitable estate of the mortgagor shall not be extinguished for twelve months after a sale under a decree in chancery, and which prevents any sale unless two-thirds of the amount at which the property has been valued by appraisers shall be bid therefor, is within the clause of the tenth section of the first article of the Constitution of the United States, which prohibits a state from passing a law impairing the obligation of contracts.

Mr. Chief Justice TANEY delivered the opinion of the court.

THIS case comes before the court upon a division of opinion in the Circuit Court of the United States for the district of Illinois, upon certain questions which arose in the case, and which have been certified to this court according to the act of Congress.

It appears from the record, that, on the 13th of July, 1838, John H. Kinzie executed a bond to Arthur Bronson, conditioned for the payment of $4000, on the 1st of July, 1842, with interest thereon, to be paid semi-annually; and, in order to secure the payment of the said sum of money and interest, Kinzie and wife, on the same day, conveyed to the said Bronson, in fee simple, by way of mortgage, one undivided half part of certain houses and lots in the town of Chicago, with the usual proviso that the deed should be null and void if the said principal and interest were duly paid; and Kinzie, among other things, covenanted that, if default should be made in the payment of the principal or interest, or any part thereof, it should be lawful for Bronson or his representatives to enter upon and sell the mortgaged premises at public auction, and, as attorney of Kinzie and wife, to convey the same to the purchaser; and out of the moneys arising from such sale, to retain the amount that might then be due him on the aforesaid bond, with the costs and charges of sale, rendering the overplus, if any, to Kinzie.

The interest not having been paid, Bronson, on the 27th of

March, 1841, filed his bill to foreclose the mortgage. In the mean time, after the mortgage was made, and before the bill was filed, the legislature of Illinois, on the 19th of February, 1841, passed a law, the 8th section of which provided that mortgagors and judgment creditors should have the same right to redeem mortgaged premises sold by the decree of a court of chancery, that had been given to the debtors and judgment creditors by a previous law passed in 1825, in cases where lands were sold under execution. The law of 1825 authorized the party whose lands should be sold by execution, after that law took effect, to redeem them within twelve months from the day of sale, by repaying the purchase-money with interest at the rate of 10 per cent.; and if the debtor did not redeem it within the time limited, any judgment creditor was authorized to do so upon the like terms, within fifteen months from the sale. This act, which took effect on the 1st of May, 1825, was held, it seems, not to extend to sales of mortgaged premises under a decree of foreclosure; and the act of February 19, 1841, above mentioned, was passed to embrace them.

By another act of the legislature of Illinois, approved the 27th of February, 1841, it was directed that, "when any execution should be issued out of any of the courts of the state, and be levied on any property, real or personal, or both, it should be the duty of the officer levying such execution to summon three householders of the proper county, one of whom should be chosen by such officer, one by the plaintiff, and one by the defendant in the execution; or, in default of the parties making such choice, the officer should choose for them; which householders, after being duly sworn by such officer so to do, should fairly and impartially value the property upon which such execution was levied, having reference to its cash value; and that they should endorse the valuation thereof upon the execution, or upon a piece of paper thereunto attached, signed by them; and when such property should be offered for sale, it should not be struck off, unless two-thirds of the amount of such valuation should be bid therefor." It further provided, among other things, that all sales of mortgaged property should be made according to the provisions of that act, whether the foreclosure of said mortgage was by judgment at law or decree in chancery. It also directed that the pro-

visions of this law should extend to all judgments rendered prior to the 1st of May, 1841, and to all judgments that might be rendered on any contract or cause of action accruing prior to that day, and not to any other judgments than as before specified. These are, in substance, the provisions of these acts, as far as they are material to the present controversy.

On the 19th of June, 1841, after the laws above mentioned had been passed, the Circuit Court of the United States for the district of Illinois adopted the following rules:

" Ordered, that when the marshal shall levy an execution upon real estate, he shall have it appraised and sold under the provisions of the law of this state, entitled ' An act regulating the sale of property,' approved February 27, 1841, if the case come within the provisions of that law ; and any two or three householders selected under the law, agreeing, may make the valuation of the premises required.

" Before the sale of any real estate on execution, the marshal shall give notice thirty days in a newspaper published in the county where the land lies ; and if there be no paper published in the county, then the notice shall be given thirty days before the sale, by notice, as the statute requires. The court adopt the 8th section of the act of this state, to amend the act concerning judgments, &c., passed 19th of February, 1841, which regulates the sale of mortgaged premises, &c., except where special direction shall be given in the decree of sale."

After these rules were adopted—that is to say, at December term, 1841—the bill filed by Bronson, as hereinbefore mentioned, came on for final hearing in the Circuit Court ; and thereupon the complainant moved the court for a final decree of strict foreclosure of said mortgage, or that the mortgaged premises should be sold to the highest bidder, without being subject to said rule and the act referred to. This motion was resisted on part of defendants, who moved that the decree should direct the sale according to said rule and act.

And the judges being opposed in opinion on the following points, to wit:

1. Whether the decree in this case should be so entered as to direct the sale of the said mortgaged premises according to the said statute of the state of Illinois above mentioned ; or whether

the same premises should be sold at public auction, to the highest bidder, without regard to the said law.

2. Whether the decree in this case shall or shall not direct the sale of the mortgaged premises, without being first valued by three householders, and without requiring two-thirds of the amount of the said valuation to be bid, according to the said act of the state of Illinois.

3. Whether the terms of the mortgage in this case do or do not require it to be excepted from the operation of the rule above recited.

On motion of the complainant, it was ordered and directed that this cause, with said points, be certified to the Supreme Court, in pursuance of the act of Congress. And it is upon these questions, thus certified, that the case is now before us; and the 8th section of the act of February 19th, and the entire act of February 27, are set forth at large in the record, as the laws referred to in the above-mentioned rules of the Circuit Court. The case has been submitted to the court, for decision, by a written agreement between the counsel on both sides. On the part of the complainant, a printed argument has been filed, but none has been offered on behalf of the defendant. As the case involves a constitutional question of great importance, we should have preferred a full argument at the bar. But the parties are entitled, by the rules of the court, to bring it before us in the manner they have adopted; and it being our duty to decide the questions certified to us by the Circuit Court, we have bestowed upon the subject the careful and deliberate consideration which its importance demands.

Upon the points certified, the question is, whether the laws of Illinois, of the 19th and the 27th of February, 1841, come within that clause of the 10th section of the 1st article of the Constitution of the United States, which prohibits a state from passing a law impairing the obligation of contracts.

The laws of a state, regulating the process of its courts, and prescribing the manner in which it shall be executed, of course, do not bind the courts of the United States, whose proceedings must be governed by the acts of Congress. The act of 1792, however, adopted the process used in the state courts, as it stood in 1789; and, since then, the act of 1828, on the same subject,

has been passed: and the 3d section of this law directs that final process issued on judgments and decrees in any of the courts of the United States, and the proceedings thereupon, shall be the same, except their style, in each state, respectively, as were then used in the courts of such state, and authorizes the courts of the United States, if they see fit, in their discretion, by rules of court, so far to alter final process as to conform the same to any change which might afterwards be adopted, by the legislatures of the respective states, for the state courts. Any acts of a state legislature, therefore, in relation to final process, passed since 1828, are of no force in the courts of the United States, unless adopted by rules of court, according to the provisions of this act of Congress. And, although such state laws may have been so adopted, yet, they are inoperative and of no force, if in conflict with the Constitution or an act of Congress.

As concerns the obligations of the contract upon which this controversy has arisen, they depend upon the laws of Illinois as they stood at the time the mortgage deed was executed. The money due was indeed to be paid in New York. But the mortgage given to secure the debt was made in Illinois for real property situated in that state, and the rights which the mortgagee acquired in the premises depended upon the laws of that state. In other words, the existing laws of Illinois created and defined the legal and equitable obligations of the mortgage contract.

If the laws of the state passed afterwards had done nothing more than change the remedy upon contracts of this description, they would be liable to no constitutional objection. For, undoubtedly, a state may regulate at pleasure the modes of proceeding in its courts in relation to past contracts as well as future. It may, for example, shorten the period of time within which claims shall be barred by the statute of limitations. It may, if it thinks proper, direct that the necessary implements of agriculture, or the tools of the mechanic, or articles of necessity in household furniture, shall, like wearing apparel, not be liable to execution on judgments. Regulations of this description have always been considered, in every civilized community, as properly belonging to the remedy, to be exercised or not by every sovereignty, according to its own views of policy and humanity. It must reside in every state to enable it to secure its citizens from unjust and

harassing litigation, and to protect them in those pursuits which are necessary to the existence and well-being of every community. And, although a new remedy may be deemed less convenient than the old one, and may in some degree render the recovery of debts more tardy and difficult, yet it will not follow that the law is unconstitutional. Whatever belongs merely to the remedy may be altered according to the will of the state, provided the alteration does not impair the obligation of the contract. But if that effect is produced, it is immaterial whether it is done by acting on the remedy or directly on the contract itself. In either case it is prohibited by the Constitution.

This subject came before the Supreme Court in the case of Green *v.* Biddle, decided in 1823, and reported in 8 Wheat. 1. It appears to have been twice elaborately argued by counsel on both sides, and deliberately considered by the court. On the part of the demandant in that case, it was insisted that the laws of Kentucky passed in 1797 and 1812, concerning occupying claimants of land, impaired the obligation of the compact made with Virginia in 1789. On the other hand, it was contended that these laws only regulated the remedy, and did not operate on the right to the lands. In deciding the point the court say, " It is no answer that the acts of Kentucky now in question are regulations of the remedy, and not of the right to the lands. If these acts so change the nature and extent of existing remedies as materially to impair the rights and interests of the owner, they are just as much a violation of the compact as if they directly overturned his rights and interests." And in the opinion delivered by the court after the second argument, the same rule is reiterated in language equally strong. (See pages 75,* 76, and 84.) This

---

* "Nothing, in short, can be more clear, upon principles of law and reason, than that a law which denies to the owner of land a remedy to recover the possession of it when withheld by any person, however innocently he may have obtained it; or to recover the profits received from it by the occupant; or which clogs his recovery of such possession and profits, by conditions and restrictions tending to diminish the value and amount of the thing recovered, impairs his right to, and interest in, the property. If there be no remedy to recover the possession, the law necessarily presumes a want of right to it. If the remedy afforded be qualified and restrained by conditions of any kind, the right of the owner may indeed subsist, and be acknowledged, but it is impaired, and rendered insecure, according to the nature and extent of such restrictions." 8 Wheat. 75.

Bronson *v.* Kinzie et al.

judgment of the court is entitled to the more weight, because the opinion is stated in the report of the case to have been unanimous; and Judge Washington, who was the only member of the court absent at the first argument, delivered the opinion of the second.

We concur entirely in the correctness of the rule above stated. It is difficult, perhaps, to draw a line that would be applicable in all cases between legitimate alterations of the remedy and provisions which, in the form of remedy, impair the right. But it is manifest that the obligation of the contract, and the rights of a party under it, may, in effect, be destroyed by denying a remedy altogether; or may be seriously impaired by burdening the proceedings with new conditions and restrictions, so as to make the remedy hardly worth pursuing. And no one, we presume, would say that there is any substantial difference between a retrospective law declaring a particular contract or class of contracts to be abrogated and void, and one which took away all remedy to enforce them, or encumbered it with conditions that rendered it useless or impracticable to pursue it. Blackstone, in his Commentaries on the Laws of England, 1 vol. 55, after having treated of the declaratory and directory parts of the law, defines the remedial in the following words:

" The remedial part of the law is so necessary a consequence of the former two, that laws must be very vague and imperfect without it. For, in vain would rights be declared, in vain directed to be observed, if there were no method of recovering and asserting those rights when wrongfully withheld or invaded. This is what we mean properly when we speak of the protection of the law. When, for instance, the declaratory part of the law has said that the field or inheritance which belonged to Titius's father is vested by his death in Titius; and the directory part has forbidden any one to enter on another's property without the leave of the owner; if Gaius, after this, will presume to take possession of the land, the remedial part of the law will then interpose its office, will make Gaius restore the possession to Titius, and also pay him damages for the invasion."

We have quoted the entire paragraph, because it shows, in a few plain words, and illustrates by a familiar example, the connection of the remedy with the right. It is the part of the municipal law

which protects the right, and the obligation by which it enforces and maintains it. It is this protection which the clause in the Constitution now in question mainly intended to secure. And it would be unjust to the memory of the distinguished men who framed it, to suppose that it was designed to protect a mere barren and abstract right, without any practical operation upon the business of life. It was undoubtedly adopted as a part of the Constitution for a great and useful purpose. It was to maintain the integrity of contracts, and to secure their faithful execution throughout this Union, by placing them under the protection of the Constitution of the United States. And it would but ill become this court, under any circumstances, to depart from the plain meaning of the words used, and to sanction a distinction between the right and the remedy, which would render this provision illusive and nugatory; mere words of form, affording no protection, and producing no practical result.

We proceed to apply these principles to the case before us. According to the long-settled rules of law and equity in all of the states whose jurisprudence has been modelled upon the principles of the common law, the legal title to the premises in question vested in the complainant, upon the failure of the mortgagor to comply with the conditions contained in the proviso; and at law, he had a right to sue for and recover the land itself. But, in equity, this legal title is regarded as a trust estate, to secure the payment of the money; and, therefore, when the debt is discharged, there is a resulting trust for the mortgagor. Conard *v.* The Atlantic Insurance Company, 1 Peters, 441. It is upon this construction of the contract, that courts of equity lend their aid either to the mortgagor or mortgagee, in order to enforce their respective rights. The court will, upon the application of the mortgagor, direct the reconveyance of the property to him, upon the payment of the money; and, upon the application of the mortgagee, it will order a sale of the property to discharge the debt. But, as courts of equity follow the law, they acknowledge the legal title of the mortgagee, and never deprive him of his right at law until his debt is paid; and he is entitled to the aid of the court to extinguish the equitable title of the mortgagor, in order that he may obtain the benefit of his security. For this purpose, it is his absolute and undoubted right, under an ordinary mortgage deed,

if the money is not paid at the appointed day, to go into the Court of Chancery, and obtain its order for the sale of the whole mortgaged property, (if the whole is necessary,) free and discharged from the equitable interest of the mortgagor.   This is his right, by the law of the contract; and it is the duty of the court to maintain and enforce it, without any unreasonable delay.

When this contract was made, no statute had been passed by the state changing the rules of law or equity in relation to a contract of this kind.   None such, at least, has been brought to the notice of the court; and it must, therefore, be governed, and the rights of the parties under it measured, by the rules above stated. They were the laws of Illinois at the time; and, therefore, entered into the contract, and formed a part of it, without any express stipulation to that effect in the deed.   Thus, for example, there is no covenant in the instrument giving the mortgagor the right to redeem, by paying the money after the day limited in the deed, and before he was foreclosed by the decree of the Court of Chancery.   Yet no one doubts his right or his remedy; for, by the laws of the state then in force, this right and this remedy were a part of the law of the contract, without any express agreement by the parties.   So, also, the rights of the mortgagee, as known to the laws, required no express stipulation to define or secure them.   They were annexed to the contract at the time it was made, and formed a part of it; and any subsequent law, impairing the rights thus acquired, impairs the obligations which the contract imposed.

This brings us to examine the statutes of Illinois which have given rise to this controversy.   As concerns the law of February 19, 1841, it appears to the court not to act merely on the remedy, but directly upon the contract itself, and to engraft upon it new conditions injurious and unjust to the mortgagee.   It declares that, although the mortgaged premises should be sold under the decree of the Court of Chancery, yet that the equitable estate of the mortgagor shall not be extinguished, but shall continue for twelve months after the sale; and it moreover gives a new and like estate, which before had no existence, to the judgment creditor, to continue for fifteen months.   If such rights may be added to the original contract by subsequent legislation, it would be difficult to say at what point they must stop.   An equitable

interest in the premises may, in like manner, be conferred upon others; and the right to redeem may be so prolonged, as to deprive the mortgagee of the benefit of his security, by rendering the property unsaleable for any thing like its value. This law gives to the mortgagor, and to the judgment creditor, an equitable estate in the premises, which neither of them would have been entitled to under the original contract; and these new interests are directly and materially in conflict with those which the mortgagee acquired when the mortgage was made. Any such modification of a contract by subsequent legislation, against the consent of one of the parties, unquestionably impairs its obligations, and is prohibited by the Constitution.

The second point certified arises under the law of February 27, 1841. The observations already made in relation to the other act apply with equal force to this. It is true that this law apparently acts upon the remedy, and not directly upon the contract. Yet its effect is to deprive the party of his pre-existing right to foreclose the mortgage by a sale of the premises, and to impose upon him conditions which would frequently render any sale altogether impossible. And this law is still more objectionable, because it is not a general one, and prescribing the mode of selling mortgaged premises in all cases, but is confined to judgments rendered, and contracts made, prior to the 1st of May, 1841. The act was passed on the 27th of February in that year; and it operates mainly on past contracts, and not on future. If the contracts intended to be affected by it had been specifically enumerated in the law, and these conditions applied to them, while other contracts of the same description were to be enforced in the ordinary course of legal proceedings, no one would doubt that such a law was unconstitutional. Here a particular class of contracts is selected, and encumbered with these new conditions; and it can make no difference, in principle, whether they are described by the names of the parties, or by the time at which they were made.

In the case before us, the conflict of these laws with the obligations of the contract is made the more evident by an express covenant contained in the instrument itself, whereby the mortgagee, in default of payment, was authorized to enter on the premises, and sell them at public auction; and to retain out

of the money thus raised, the amount due, and to pay the overplus, if any, to the mortgagor.   It is impossible to read this covenant, and compare it with the laws now under consideration, without seeing that both of these acts materially interfere with the express agreement of the parties contained in this covenant.   Yet, the right here secured to the mortgagee is substantially nothing more than the right to sell, free and discharged of the equitable interest of Kinzie and wife, in order to obtain his money.   Now, at the time this deed was executed, the right to sell, free and discharged of the equitable estate of the mortgagor, was a part of every ordinary contract of mortgage in the state, without the aid of this express covenant; and the only difference between the right annexed by law and that given by the covenant consists in this: that in the former case, the right of sale must be exercised under the direction of the Court of Chancery, upon such terms as it shall prescribe, and the sale made by an agent of the court; in the latter, the sale is to be made by the party himself.   But, even under this covenant, the sale made by the party is so far subject to the supervision of the court, that it will be set aside, and a new one ordered, if reasonable notice is not given, or the proceedings be regarded, in any respect, as contrary to equity and justice. There is, therefore, in truth but little material difference between the rights of the mortgagee with or without this covenant.   The distinction consists rather in the form of the remedy, than in the substantial right; and as it is evident that the laws in question invade the right secured by this covenant, there can be no sound reason for a different conclusion, where similar rights are incorporated by law into the contract, and form a part of it at the time it is made.

Mortgages made since the passage of these laws must undoubtedly be governed by them; for every state has the power to prescribe the legal and equitable obligations of a contract to be made and executed within its jurisdiction.   It may exempt any property it thinks proper from sale, for the payment of a debt; and may impose such conditions and restrictions upon the creditor as its judgment and policy may dictate.   And all future contracts would be subject to such provisions; and they would be obligatory upon the parties in the courts of the United States, as well as in those of the state.  We speak, of course, of con-

Bronson *v.* Kinzie et al.

tracts made and to be executed in the state.  It is a case of that description that is now before us; and we do not think it proper to go beyond it.

Upon the questions presented by the Circuit Court, we therefore answer:

1. That the decree should direct the premises to be sold at public auction to the highest bidder, without regard to the law of February 19, 1841, which gives the right of redemption to the mortgagor for twelve months, and to the judgment creditor for fifteen.

2. That the decree should direct the sale of the mortgaged premises, without being first valued by three householders, and without requiring two-thirds of the amount of the said valuation to be bid according to the law of February 27, 1841.

The decision of these two questions disposes of the third.  And we shall direct these answers to be certified to the Circuit Court.*

Mr. Justice McLEAN dissented.

The act of Illinois of the 27th February, 1841, does not apply to the case under consideration.  The rule of the Circuit Court adopting that act, limits it to executions on judgments at law.  It can have no application, therefore, to any proceeding in chancery. The only rule adopted in relation to a chancery proceeding, is that which gives the mortgagor a year within which to redeem the premises sold, on the payment of the purchase-money and 10 per cent. interest, agreeably to the 8th section of the act of 19th February, 1841.  And that rule was to operate only in decrees of foreclosure and sale, where a different order was not made.  So that, in fact, no positive rule was adopted in Illinois by the Circuit Court, in relation to sales of mortgaged premises under a decree.

By the rules regulating chancery proceedings adopted by this court at its last term, it is supposed the above rule and all others regulating the practice in chancery was rescinded.  But this is not material.  The points certified would be answered by saying, that the acts of the legislature referred to can have no operation

---

* Present Mr. Chief Justice TANEY; and Justices THOMPSON, McLEAN, BALD-WIN, WAYNE, CATRON, and DANIEL.

in the case; as no state law can govern the proceedings of a chancery court of the United States.

Under such circumstances, I cannot but regret that the court have deemed it necessary or proper to consider the constitutionality of the above acts, and to hold that they are unconstitutional. The decision of the matters before the court does not require this judgment. And it is the more to be regretted, as there was no argument, written or oral, to sustain these laws. Heretofore this court have not deemed it proper to act on so grave a subject as the constitutionality of a state law, unless the question were essentially involved in the decision of the case before them.

The act of the 27th of February, 1841, is held to be unconstitutional as regards all contracts or mortgages entered into prior to its enactment, because it requires real property levied on by execution to be appraised and to sell for two-thirds of its value.

As preliminary to an examination of this question, I will take a cursory review of the policy and laws of the federal government in respect to state process. By the act of the 29th September, 1789, it is provided, " that the forms of writs and executions, except their style, in the Circuit and District Courts, in suits at common law, shall be the same in each state respectively as are now used, or allowed, in the Supreme Court of the same."

Again: By the act of the 8th of May, 1792, the above provision is re-enacted, " subject to such alterations and additions as the courts respectively shall, in their discretion, deem expedient; or to such regulations as the Supreme Court of the United States shall think proper, from time to time, by rule to prescribe to any Circuit or District Court concerning the same."

In the 8th section of the act of the 2d March, 1793, it is provided, " that where it is now required by the laws of any state, that goods taken in execution, on a writ of *fieri facias*, shall be appraised previous to the sale thereof, it shall be lawful for the appraisers appointed under the authority of the state to appraise goods taken in execution on a *fieri facias* issued out of any court of the United States, in the same manner as if such writ had issued out of a state court." And it is made the duty of the marshal to summon appraisers, &c.

Under the foregoing process acts, a question was made in the state of Kentucky, whether the executions from the Circuit Court

of the United States should be governed by the laws of that state. In the case of Wayman *v.* Southard, 10 Wheat. 2, among several points certified from the Circuit Court, for the decision of this court, were the two following.:

"That, if the statutes of Kentucky, in relation to executions, are binding on this court, viz.: the statute which requires the plaintiff to endorse on the execution, that bank notes of the Bank of Kentucky, or notes of the Bank of the Commonwealth of Kentucky, will be received in payment, or that the defendant may replevy the debt for two years, are in violation of the Constitution of the United States."

"That all the statutes of Kentucky, which authorize a defendant to give a replevin bond, in satisfaction of a judgment or execution are unconstitutional and void."

This court held that the process acts of 1789, and of 1792, did not apply to states subsequently admitted into the Union; and that as the act regulating executions had not been adopted by the Circuit Court of the United States for Kentucky, it could not regulate final process in that court. But the court did not deem it necessary or proper to decide on the constitutionality of the laws referred to.

In the case of the Bank of the United States *v.* Halstead, 10 Wheat. 51, a point was certified from the Circuit Court of Kentucky, involving the question, whether "the act of Assembly of Kentucky, of the 21st December, 1821, which prohibits the sale of property taken under executions for less than three-fourths of its appraised value, was repugnant to the Constitution of the United States." And this court held, Judge Thompson giving the opinion, as in the case of Wayman *v.* Southard, that the law of the state did not apply to the courts of the United States, it never having been adopted. And they remark: "This renders it unnecessary to inquire into the constitutionality of the law of Kentucky."

These cases in principle are analogous to the one under consideration. The only rule of court affecting a proceeding in chancery having been repealed or rescinded by the general rules adopted by this court at its last term, and if not repealed does not apply; the laws of the state of Illinois, as regards the proceeding under consideration, are as inapplicable as were the laws of Ken-

tucky in the above cases.  And it is a subject of regret, that the precedent of the above cases has not been followed in the present decision.

Out of the above decisions grew the process act of the 19th May, 1828.  That act declares, " that writs of execution and other final process, issued on judgments and decrees rendered in any of the courts of the United States, and the proceedings thereupon, shall be the same as are now used in the courts of the state." And power was given to " the courts, if they shall see fit in their discretion, by rules of courts, so far to alter final process in said courts as to conform the same to any change which may be adopted by the legislatures of the respective states for the state courts."

The above enactments show that the settled policy of the federal government is, to adopt the state laws regulating final process. And so far as the acts of Congress have operated, state laws have governed executions in the federal courts.

In Virginia real estate is not liable to be sold on execution.  In Connecticut, and, I believe, in Massachusetts, lands are taken in satisfaction of judgments on a valuation.   In Ohio, and in many of the other states, real estate must be sold for one-half or two-thirds of its valuation.   In Indiana, and in some of the other states, the defendant has a right within twelve months to redeem his land sold on execution, on paying some 10 or 12 per cent. interest.   In Virginia, Mississippi, and some of the other states, forthcoming bonds are given, which suspend further proceedings on executions, and in some degree changes the security under the judgment.

Now these laws prevail in some of the states, and there is no reason why, under the Constitution, they may not be adopted in all of them.   If Virginia may withdraw her lands from execution, and Ohio admit them to be sold under a valuation, why may not Illinois do the same ?

But I understand the objection to the Illinois statute is, its limited operation and its applicability to prior contracts.

The 2d section of the act provides, that it " shall extend to all judgments rendered prior to the 1st of May, 1841, and to all judgments that may be rendered on any contract or cause of action, accruing prior to the 1st May, 1841."

2 E

This provision may seem to be somewhat capricious and of doubtful policy; but the inquiry must be, does it violate the Constitution of the United States? On the 27th February, 1841, this law was enacted, and although it is limited in its effects, yet it is general in its provisions. And I know of no power in the Constitution to limit the legislative discretion of the states as to the duration of their enactments. The only question under this act as to its constitutionality must be, whether it impairs the obligations of contracts entered into before it was passed. And in this view, the question arises, whether the remedy, in the sense of the Constitution, can be considered as a part of the contract.

That the law objected to is remedial, no one can controvert. It does not purport to act upon contracts, but modifies the remedy for the enforcement of contracts. But my brethren suppose, that, as this remedy may be retarded by the limitation on the sale of land under judgments, the obligation of the contract is thereby impaired. This conclusion can only be sustained on the ground that the remedy is a part of the contract. On this hypothesis every contract embraces the existing remedy, and that remedy cannot be protracted by the legislature. This is a question of constitutional power, and cannot be affected by any notions of expediency. If the remedy be so modified as to protract the recovery of a debt a week, or a month, in the view now taken by the court, it impairs the obligation of the contract as clearly as any longer period of time. The question cannot, in any degree, depend upon time. What could be more preposterous than to say the legislature of a state may prolong the remedy a week, a month, or three months, but cannot prolong it beyond that period? Where shall this judicial discretion find a limit? There must be some limit. If the legislature may not modify the remedy at their discretion, in regard to existing contracts, they must be prohibited from making any change. Any departure from this rule of construction must depend upon the arbitrary decision of the courts. And each court, in this respect, may exercise its own discretion, until the question shall be settled by this tribunal.

But the question may be asked, suppose the legislature shall repeal all remedy; is the contract not thereby impaired? This question may be asked with no more propriety and effect than

many others. May not a state fail to appoint judges, clerks, and other officers essential to the administration of justice?

I am aware that, in the case of Green *v.* Biddle, 8 Wheat. 17, this court say: "It is no answer, that the acts of Kentucky, now in question, are regulations of the remedy, and not of the right to lands. If these acts so change the nature and extent of existing remedies as materially to impair the rights and interests of the owner, they are just as much a violation of the compact as if they directly overturned his rights and interests."

The above question arose under the compact between Virginia and Kentucky, which declared, "that all private rights and interests of lands, within Kentucky, derived from the laws of Virginia prior to such separation, shall remain valid and secure under the laws of the proposed state, and shall be determined by the laws then existing in the state of Virginia."

The above article, say the court in their opinion, "declares in the most explicit terms that all private rights and interests of lands, derived from the laws of Virginia, shall remain valid and secure under the laws of Kentucky, and shall be determined by the laws then existing in Virginia. It plainly imports, therefore, that these rights and interests, as to their nature and extent, shall be exclusively determined by the laws of Virginia, and that their security and validity shall not be in any way impaired by the laws of Kentucky. Whatever law, therefore, of Kentucky does narrow these rights and diminish these interests, is a violation of the compact, and is consequently unconstitutional."

And again the court observe: "The only question, therefore, is, whether the acts of 1797 and 1812 have this effect. It is undeniable that no acts of a similar character were in existence in Virginia at the time when the compact was made; and, therefore, no aid can be derived from the actual legislation of Virginia to support them." These acts were held to abridge the rights of the holder under the Virginia title, and, whether remedial or otherwise, were consequently repugnant to the compact. By the compact, the rights and interests of the Virginia claimant, both as to their nature and extent, say the court, were to be exclusively determined by the laws of Virginia. In other words, where rights are to be determined by one law, another and a repugnant law can have no influence upon them. And this was the point

adjudged in the case of Green v. Biddle. The question did not arise under the Constitution of the United States, but under the compact.

In the case of Sturges v. Crowninshield, 4 Wheat. 200, the late chief justice says: "The distinction between the obligation of a contract and the remedy given by the legislature to enforce that obligation, has been taken at the bar, and exists in the nature of things. Without impairing the obligation of the contract, the remedy may certainly be modified as the wisdom of the nation shall direct." This is the true principle laid down in explicit terms.

The doctrine that the remedy constitutes a part of the contract is a mere abstraction, which cannot be carried into practical operation. If the doctrine be sound, it secures the means for the enforcement of the contract at its date.

Now does any one doubt that a state legislature may abolish imprisonment for debt, as well on past as future contracts? Here is a modification of the remedy, which takes away a means, and often a principal means, of enforcing the payment of the debt. And yet this is admitted by all to be a constitutional law. Nor does any one doubt the constitutionality of a statute of limitations. This operates upon contracts entered into before its enactment, and bars the right of action.

Now, if the remedy existing at the time of the contract is a part of the contract, the state legislature cannot modify the remedy, much less, as by the above statute, take it away. It is no answer to this argument to say, that the statutory bar is only interposed where the obligee has been grossly negligent. There was no such condition of vigilance at the date of the contract, and if the above argument be sound, no subsequent action of the legislature can impair its obligation by materially retarding its enforcement, much less by barring the remedy.

The argument in favour of the statute is, that it does not act upon the contract, but withdraws the remedy. Now if this be a constitutional exercise of power by a state legislature, surely the exercise of the lesser power, by modifying the remedy at discretion, must also be constitutional. Does not the greater power include the lesser? The power, whether exercised in passing a statute of limitations, or in modifying the laws in relation to

judgments and executions, acts upon the remedy. In both instances the enactments constitute the laws of the forum. And in my judgment, they depend upon the same power over the remedy.

But if the remedy be a part of the contract, how must it be applied? Instead of looking to the laws regulating judicial proceedings at the time the action is brought, the court must look to the date of the contract and the laws then in force. The contract, in this view, gives vitality to laws annulled by the legislature, and the law of the remedy becomes as diversified as the contracts to which it is applied. Can such a rule of construction be enforced?

How is a contract made in one state to be enforced in another? If the remedy in the state where the contract is made enter into it, does it carry this remedy into another jurisdiction? This will not be contended; and why not? If the contract within the state include the law of the remedy, why does it not carry into a foreign jurisdiction the same conditions? Every contract does this, which is governed by the local law. A contract for the payment of money, made and to be performed in the state of New York, bears 7 per cent. interest. And this rate of interest is recovered on the contract, in a state where 7 per cent. would be usurious. And so of every other contract made under a local law, however repugnant may be its conditions to the laws and policy of the jurisdiction where the remedy is sought. This is emphatically the law of the contract. And if the remedy be also the law of the contract, it must follow the contract wherever it shall be prosecuted. If this be not the case, the argument falls; the remedy exists independently of the contract, and does not constitute a part of it.

A contract void by the local law on the ground of usury, or because it is against the policy of the law, can be enforced nowhere. There is no exception to the principle that where a contract is entered into under the sanctions of a state law, that law governs the contract in whatever jurisdiction suit may be brought on it. And so where a contract is made in one state to be performed in another, the place of performance gives the law of the contract. But in no case does the remedy attach itself to the contract, so as to constitute a part of it. Such an idea is too abstract for practical operations. At most, it could only affect contracts sued on in the state where they were made. Such a principle

could not be carried out.  It would diversify the remedy to an impracticable extent.

Every contract is entered into with a supposed knowledge by the parties, that the law-making power may modify the remedy. And this it may do, at its discretion, so far as it acts only on the remedy.  It may regulate the mode in which process shall be issued and served; how the pleadings shall be filed, and at what term judgment shall or may be entered.  And it may also regulate final process.  It may require that the personal property of the defendant shall be levied on and sold, before land shall be taken in execution.  It may say what notice shall be given on the sale of real estate on execution; and also require that it shall sell for one-half or two-thirds of its value.  A valuation law in those states where it has been adopted has been found salutary in guarding the rights of debtor and creditor.  A debtor, under this law, cannot defeat the claim of his creditor, by purchasing the real estate levied on, through the agency of a friend, at a nominal price; and this protects the rights of the creditors of the defendant generally.  There may be some cases of hardship to creditors under such a law, but they must be few and unimportant in comparison with the benefits secured by the law both to creditors and debtors.  Some restriction on the sale of land on execution is required by a sound policy, especially in new and rising states, where real property can scarcely be said to have a final value.

But this law is supposed to be unconstitutional from its retrospective effect.  I had supposed that such a supposition could not be raised, under the decision of this court.

In the case of Satterlee *v.* Matthewson, 2 Peters, 407, "the plaintiff, at the trial, set up a title under a warrant dated the 10th January, 1812, founded upon an improvement in the year 1785, which it was admitted was under a Connecticut title, and a patent dated 19th February, 1813.

"The defendant claimed title under a patent issued to John Wharton in the year 1781, and a conveyance by him to Satterlee in 1812."  Some time in the year 1790, the defendant had come into possession as tenant to the plaintiff, and it was insisted that the defendant was estopped from setting up his title.  The Court of Common Pleas decided in favour of the plaintiff; but on a writ of error, the Supreme Court of Pennsylvania held, that "by the

settled law of that state, the relation of landlord and tenant could not subsist under a Connecticut title." Upon which ground the judgment was reversed, and a *venire facias de novo* was awarded.

On the 8th day of April, 1826, and before the second trial of the cause took place, the legislature of that state passed a law, declaring, " that the relation of landlord and tenant shall exist, and be held as fully and effectually between Connecticut settlers and Pennsylvania claimants, as between other citizens of this commonwealth, on the trial of any cause now pending or hereafter to be brought within this commonwealth, any law or usage to the contrary notwithstanding." Under the instruction of the court in accordance with that statute, the jury found a verdict for the plaintiff, on which judgment was entered. This judgment, on being removed by writ of error to the Supreme Court of Pennsylvania, was affirmed. On the ground that the above statute impaired the obligation of the contract between Satterlee and Matthewson, the cause was removed to this court from the Supreme Court of Pennsylvania, by a writ of error.

In their opinion this court say, " If the effect of the statute in question be not to impair the obligation of the contract, is there any other part of the Constitution of the United States to which it is repugnant? It is said to be retrospective. Be it so; but retrospective laws which do not impair the obligation of contracts, or partake of the character of *ex post facto* laws, are not condemned or forbidden by any part of that instrument."

And again, " The objection is urged that the effect of this act was to divest rights which were vested by law in Satterlee. There is certainly no part of the Constitution of the United States which applies to a state law of this description; nor are we aware of any decision of this, or of any Circuit Court, which condemned such a la   upon this ground."

Here was a direct legislation not only on existing rights growing out of contracts, but such an effect was given to the law as to divest vested rights. And yet this act was held not to be in violation of the Constitution of the United States.

What vested right is there or can there be, in the nature of things, in the holder of a contract to the particular remedy for its enforcement which existed at its date? But if there were such a vested right as to the remedy, which there is not, it may, under

the above authority, be divested by law. If the decision do not mean this, it means nothing.

A state legislature cannot impair the contract by changing the time or manner of its performance. By the contract, the parties have fixed their rights and obligations; and these are guarded by the Constitution. But the remedy for the enforcement of the contract being established by the law-making power, may be modified at its discretion. This is admitted as regards subsequent contracts, but the same rule applies to prior ones. So far as the mere remedy is concerned, in my judgment, no sound and practical distinction can be drawn between prior and future contracts.

I think, in the case under consideration, that the laws of Illinois referred to do not apply, and, therefore, I agree to the answers given by the court to the points certified.

### ORDER.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the district of Illinois, and on the points and questions on which the judges of the said Circuit Court were opposed in opinion, and which were certified to this court for its opinion agreeably to the act of Congress in such case made and provided, and was argued by counsel. On consideration whereof, it is the opinion of this Court, 1st. That the decree should direct the premises to be sold at public auction to the highest bidder, without regard to the law of February 19th, 1841, which gives the right of redemption to the mortgagor for twelve months, and to the judgment creditor for fifteen. 2d. That the decree should direct the sale of the mortgaged premises without being first valued by three householders, and without requiring two-thirds of the amount of the said valuation to be bid according to the law of February 27th, 1841; and that the decision of these two questions disposes of the third. It is thereupon now here ordered and adjudged by this court, that it be so certified to the said Circuit Court.