### MURPHY v. PHILLIPS et al.
No. 9278.

Court of Civil Appeals of Texas. San Antonio.

Sept. 9, 1933.

Rehearing Denied Oct. 4, 1933.

Kelley, Looney & Norvell, of Edinburg, for appellant.

G. F. Dohrn, of Mission, for appellees.

MURRAY, Justice.

Appellant herein, Malachy Murphy, petitioned the judge of the Ninety-Second district court of Hidalgo county for an injunction restraining G. F. Dohrn, trustee, and E. O. Phillips from advertising for sale and selling certain real estate situated in Hidalgo county. Murphy bases his petition for injunction exclusively upon the provisions of House Bill No. 231, known as the Greathouse Moratorium Act. Acts 1933, Regular Session, 43d Legislature, chapter 102, page 225 (Vernon's Ann. Civ. St. art. 2218b).

. On the 31st day of March, 1932, Murphy executed a deed of trust conveying the above-mentioned real estate to G. F. Dohrn, as trustee, for the benefit of E. O. Phillips, to secure the payment of a promissory note, of even date with the deed of trust, for the principal sum of $3,300, signed by Murphy, payable to the order of Phillips and due one year after date. Murphy failed to pay this note at maturity, and Dohrn, the trustee, advertised the property for sale, the sale to take place on June 6, 1933. The district judge granted a temporary restraining order on June 3d, but, after a hearing on June 5th, such restraining order was dissolved and Murphy's prayer, in all things, denied. From the order of the trial judge dissolving the restraining order and refusing him an injunction, Murphy has prosecuted this appeal.

The essential provisions of House Bill No. 231, under the provisions of which this injunction is sought, are as follows:

Section 1 provides that, with reference to all suits pending in any trial court or filed within 180 days after the effective date of the act to foreclose any lien or liens on real property, the defendant should have the right to a postponement or continuance thereof on filing a sworn statement setting forth: (a) That the defendant is unable to pay the debt, and that the property would probably sell for less than its reasonable market value or less than its intrinsic value, and that the indebtedness did not result from fraud; (b) that the rendition of a judgment as prayed for would result in an unfair, unjust, and inequitable financial injury to the defendant; (c) that the property upon which the lien is sought to be foreclosed is not being wasted, and is substantially in as good condition as when the lien was executed, and that the defendant has not, with intent to defeat or delay collection, dissipated the property or the rents and revenues thereof; (d) that defendant is not in arrears in the payment of taxes for more than four years since February 1, 1922, on the property involved; (e) that the defendant consents to the appointment of a receiver, etc.

If it be made to appear to the court that said allegations are probably true, the court shall defer rendering judgment in said cause for as long a period as 180 days, nor shall any order of sale or execution issue until after the expiration of the time fixed by the court. The court is further authorized under certain conditions to extend this time up to May 1, 1934, making in effect a year's moratorium from the effective date of the act.

The act requires the court to take into consideration the financial condition of both plaintiffs and defendants.

Section 2 of the act permits agreed judgments.

Section 3 authorizes the court to stay sales under execution or order of sale of real property upon the same terms and conditions as are authorized by section 1 of this act and during the life of this act.

Section 4 provides that nothing shall prevent the court from granting such preliminary and ancillary remedies by injunction and otherwise, as may appear necessary for the preservation of the rights of the parties pending litigation.

Section 5 provides that nothing herein shall prevent parties from litigating cases in court and appealing from the judgment with-

out filing the motion mentioned in section 1, or if such motion is overruled, and that: "in cases where judgments are rendered and an appeal is taken, the appealing party shall be entitled to have execution or order of sale stayed and postponed pending such appeal without filing a supersedeas bond, if from the facts proven upon application for such stay order, it reasonably appears to the court that the appealing party is unable to execute a good and sufficient supersedeas bond or that it would be inequitable, unjust and unfair to permit his property * * * to become subjected to sale during the pendency of such appeal."

In section 9 it is made exclusively retroactive, and in section 10 it is said that, if any section be held unconstitutional, the remaining portion shall nevertheless be valid, and section 11 provides that all laws in conflict with any provision of this act are suspended for the period of 180 days, etc.

▮ An examination of appellant's petition reveals the fact that he has not alleged in his petition that he is unable to pay the debt as required by subparagraph (a) of section 1, nor does he allege that he consents to the appointment of a receiver, etc., as provided by subparagraph (e) of section 1, and in these particulars appellant's petition is fatally defective, and, having failed to comply with the requirements of the very act on which the petition was based, appellant was clearly not entitled to the injunction, and the trial judge, for this reason alone, was justified in not granting appellant the relief which he sought.

▮ As far as this appeal is concerned, it is not necessary to discuss this case further, but, as many cases are being brought under this act, and, as its constitutionality is being vigorously assailed, we must either here or hereafter pass upon this all-important question, so we will proceed to do so in this case.

House Bill No. 231 was the fourth moratorium or stay law passed by the Forty-Third Legislature at its regular session staying the sale of real estate under judicial sales or trustee sales.

(1) Senate Bill No. 418 (Vernon's Ann. Civ. St. art. 3804 note) stayed all such sales for the month of March, 1933.

(2) Senate Bill No. 489 (Vernon's Ann. Civ. St. art. 3804 note) stayed all such sales for the month of April, 1933.

(3) House Bill No. 914 (Vernon's Ann. Civ. St. art. 3804 note) stayed all such sales for the month of May, 1933. Thus House Bill No. 231 (Vernon's Ann. Civ. St. art. 2218b) became the fourth moratorium or stay law.

It is pointed out that House Bill No. 231 does not grant a stay of sale as a matter of right, but, on the contrary, a sworn written statement must be filed setting up certain facts before the stay will be granted. The facts which must be set forth are stated in subparagraphs a, b, c, d, and e of section 1 as appears above. These conditions exist in practically every forced sale of real estate, so the stay might almost as well have been granted as a matter of right as to be granted under such circumstances.

It is pointed out that House Bill No. 231 provides that a receiver may be appointed or that the rents and revenues derived from the property may be applied upon the indebtedness, thus providing for compensation to the mortgagee. However, if the property is producing no rents or revenues, the mortgagee receives nothing. Thus the mortgagee may or may not receive compensation under the provisions of this act for the indulgence he is forced to give to the mortgagor.

That this act violates the "Bill of Rights" contained in both our state and Federal Constitutions, which prohibit the passage of legislation impairing the obligation of a contract, there can be no doubt. Decisions to this effect are plentiful by our United States Supreme Court and the Supreme Court of this state, as well as practically all of the other states. Space will permit the citing of only a few of these cases: Dallas County Levee Improvement District v. Rugel (Tex. Com. App.) 36 S.W.(2d) 188; Walker v. Whitehead, 16 Wall. 314, 21 L. Ed. 357; Sturges v. Crowninshield, 4 Wheat. 122, 4 L. Ed. 529; Ogden v. Saunders, 12 Wheat. 213, 6 L. Ed. 606; Farmers' Life Ins. Co. v. Wolters (Tex. Com. App.) 10 S.W.(2d) 698; McCracken v. Hayward, 2 How. 608, 11 L. Ed. 397; Edwards v. Kearzey, 96 U. S. 595, 24 L. Ed. 793; International Bldg. & Loan Ass'n v. Hardy, 86 Tex. 610, 26 S. W. 497, 24 L. R. A. 284, 40 Am. St. Rep. 870; Thompson v. Cobb, 95 Tex. 140, 65 S. W. 1090, 93 Am. St. Rep. 820; Bronson v. Kinzie, 1 How. 311, 11 L. Ed. 143; Barnitz v. Beverly, 163 U. S. 118, 16 S. Ct. 1042, 41 L. Ed. 93; Life Ins. Co. of Virginia v. R. C. Sanders (Tex. Civ. App.) 62 S.W.(2d) 348; State ex rel. Cleveringa v. Klein (N. D.) 249 N. W. 118; David v. Timon (Tex. Civ. App.) 183 S. W. 88; Luter v. Hunter, 30 Tex. 689, 98 Am. Dec. 494; Jones v. McMahan, 30 Tex. 719; 6 R. C. L. § 194, par. 197. In Blaisdell v. Home Building & Loan Ass'n (Minn. Sup. Court July 7, 1933) 249 N. W. 334, while upholding a stay law of that state upon a different proposition, the court freely admitted that such law violated the inhibitions contained in the Bill of Rights against the impairment of the obligations of contracts.

▮ The real ground upon which it is contended that House Bill No. 231 is constitutional is that it is a valid exercise of the police power of the state in the face of a great emergency for the protection of the general welfare and intended only as a temporary measure. In other words, that, when

a great emergency arises threatening the general welfare of the state and the police power is exercised to protect the general welfare, the police power becomes superior to the inhibitions contained in the Bill of Rights.

In discussing this proposition, let us first analyze that power of government known as the police power of the state. In Spann v. City of Dallas, 111 Tex. 350, 235 S. W. 513, 515, 19 A. L. R. 1387, Chief Justice Phillips, speaking for the Supreme Court of this state, said: "The police power is a grant of authority from the people to their governmental agents for the protection of the health, the safety, the comfort and the welfare of the public. In its nature it is broad and comprehensive. It is a necessary and salutary power, since without it society would be at the mercy of individual interest and there would exist neither public order nor security. While this is true, it is only a power. It is not a right. The powers of government, under our system, are nowhere absolute. They are but grants of authority from the people, and are limited to their true purposes. The fundamental rights of the people are inherent and have not been yielded to governmental control. They are not the subjects of governmental authority. They are the subjects of individual authority. Constitutional powers can. never transcend constitutional rights. The police power is subject to the limitations imposed by the Constitution upon every power of government; and it will not be suffered to invade or impair the fundamental liberties of the citizen, those natural rights which are the chief concern of the Constitution and for whose protection it was ordained by the people. All grants of power are to be interpreted in the light of the maxims of Magna Charta and the Common Law as transmuted into the Bill of Rights; and those things which those maxims forbid cannot be regarded as within any grant of authority made by the people to their agents. Cooley, Const. Lim. 209."

Again in 6 R. C. L. § 190, in speaking of the exercise of police power, we find the following: "The police power under the American constitutional system has been left to the states. It has always belonged to them and was not surrendered by them to the general government, nor directly restrained by the constitution of the United States. Each state has the power therefore to regulate the relative rights and duties of all persons, individuals and corporations, within its jurisdiction, for the public convenience and the public good. The only limit to its exercise in the enactment of laws is that they shall not prove repugnant to the provisions of the state or national constitution. * * *"

Again section 195 reads as follows: "The constitutional prohibition upon state power impairing the obligation of contracts does not restrict the power of the state to protect the public health, the public morals, or the public safety, as the one or the other may be involved in the execution of such contracts. Rights and privileges arising from contracts with a state are subject to regulations for the protection of the public health, the public morals, and the public safety, in the same sense, and to the same extent, as are all contracts and all property, whether owned by natural persons or corporations. Hence it is that not all legislation which has the effect of impairing a contract is obnoxious to the constitutional prohibition as to impairment. Familiar instances of this principal are where parties enter into contracts, perfectly lawful at the time, to sell liquor, operate a brewery or distillery, or carry on a lottery, all of which are subject to impairment by a change of policy on the part of the state, prohibiting the establishment or continuance of such traffic; in other words, that parties, by entering into contracts, may not estop the Legislature from enacting laws intended for the public good. The authority of the Legislature, in the exercise of its police powers, cannot be limited or restricted by the provisions of contracts between individuals or corporations, or between individuals and municipal corporations."

Also section 217, page 224, reads as follows: "It is laid down as a fundamental principle that persons or corporations engaged in occupations in which the public have an interest or use may be regulated by statute. The reasons assigned are that the persons engaged in such occupations are in the exercise of a public franchise, or special privileges, not enjoyed by others not so engaged; that their business implies a trust and public duty; and that the government has, therefore, the power to see that this trust is not abused, and that the duty imposed by it is properly performed. Where one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public, for the common good, to the extent of the interest he has thus created. The tendency has been rather to extend than to limit the domain of this principle, and consequently it has been denuded of the limiting element which was originally supposed to beset it—that to justify regulation of a business the business must have a monopolistic character. Furthermore, it is now recognized that a business may be so far affected with a public interest as to permit legislative regulation, although no public trust is imposed upon the property, and although the public may not have a legal right to demand and receive service; and the presence or absence of a requirement as to a license is immaterial. The right of control of businesses affected with a public use does not in any way depend on the existence of a reserved right of control incorporated in the charter granted to the corporation engaged therein. A man is not necessarily deprived

of his property without due process of law by statutes limiting the use and enjoyment of property, when the property is affected with a public use, or is employed as an accessory in carrying on such business. For example, railroad corporations hold their property and exercise their functions for the public benefit, and they are therefore subject to legislative control; the Legislature which has created them may regulate the mode in which they shall transact their business, and the price which they shall charge for transportation of freight and passengers; and it may make all such regulations as are appropriate to protect the lives of persons carried upon railroads, or passing upon highways crossed by railroads. All this is within the domain of legislative power, although the power to alter and amend the charters of such corporations has not been reserved. It is fundamental that such legislation violates no contract, takes away no property, and interferes with no vested right. The same general principles apply to common carriers generally, and many other forms of business."

■ It is readily deducible from the above quotations (1) that the police power is subject to the bill of rights and must not violate its inhibitions; (2) that where, in the proper exercise of the police power, a contract is incidentally impaired, there is no violation of the constitution; (3) that public service agencies are subject to police regulation, even though contracts be incidentally impaired. However, the Supreme Courts of this state and of the United States have universally and consistently held that, where a police regulation directly impairs the obligation of a contract, it is contrary to the Bill of Rights and null and void. Bronson v. Kinzie, supra; Thompson v. Cobb, supra.

Article 1, § 10, U. S. Constitution, provides as follows: "No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility."

Article 1, § 16, Texas Constitution, provides as follows: "No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made."

Section 29, same article, provides as follows: "To guard against transgressions of the high powers herein delegated, we declare that everything in this 'Bill of Rights' is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto, or to the following provisions, shall be void."

By these constitutional provisions the power of the Legislature of this state to enact legislation which directly impairs the obligation of a contract is not only taken out of the police power of the state, but all powers of government.

■ When the Legislature has clearly and directly done that which our Bill of Rights says shall not be done, then it becomes the duty of the judiciary to declare such enactments null and void. Bronson v. Kinzie, 1 How. 311, 11 L. Ed. 143, Sturges v. Crowninshield, 4 Wheat. 122, 4 L. Ed. 529.

It is contended that House Bill No. 231 is supported by the Washington, D. C., Housing Case, the New York Housing Cases, the Supreme Court of Minnesota in the case of Blaisdell v. Home Building & Loan Association, delivered July 7, 1933, 249 N. W. 334. It is in effect conceded by advocates of House Bill No. 231 that, unless these cases furnish a basis for upholding this act, it cannot be sustained. The Washington, D. C., Housing Case, Block v. Hirsh, 256 U. S. 135, 41 S. Ct. 458, 459, 65 L. Ed. 865, 16 A. L. R. 165, upholds the constitutionality of an act of Congress which provided in effect that a lessee could continue in possession of leased premises after the expiration of his term, against the demand of his landlord, and in direct opposition to the covenants of the lease, so long as he pays the rent and performs the conditions as fixed by the lease, or as modified by a commission erected by the statute. That decision was rendered by five justices favoring the decision and four dissenting. Mr. Justice McKenna delivered a very strong dissenting opinion. However, the majority opinion became the decision of the highest court of the land. That case is of little assistance to us in passing on the case at bar. In that case the court was passing upon an act of Congress and not the act of a state Legislature. Neither section 10, art. 1, of the United States Constitution, nor section 16, art. 1, of the Texas Constitution, could be applied to that act. The Federal Constitution says: "No State shall * * * pass any * * * Law impairing the Obligation of Contracts." Obviously, this section applies only to states and has no application to Congress. The inhibition in the state Constitution does not apply to Congress; hence neither of the constitutional inhibitions we are here applying to the moratorium law could have any application upon an act of Congress. There are some general statements in that opinion, however, which seem to declare that the police power when properly exercised is superior to the inhibition in the Bill of Rights, but what the opinion really holds is this, that the renting of houses in the District of Columbia, due to the emergency that then existed, had become a business clothed with a public interest and, as such, was subject to regulation the same as other public service companies. Quoting from that opinion:

"The general proposition to be maintained is that circumstances have clothed the letting of buildings in the District of Columbia with a public interest so great as to justify regulation by law."

The New York Housing Cases, Marcus Brown Co. v. Feldman, 256 U. S. 170, 41 S. Ct. 465, 65 L. Ed. 877, Levy Leasing Co. v. Siegel, 258 U. S. 242, 42 S. Ct. 289, 66 L. Ed. 595, Chastleton Corporation v. Sinclair, 264 U. S. 543, 44 S. Ct. 405, 68 L. Ed. 841, follow the Washington, D. C., Housing Case, and uphold the New York law upon the same theory that the renting of houses had, under the then existing emergency in the city of New York, become a business clothed with a public interest, and therefore subject to regulation.

In Pennsylvania Coal Co. v. Mahon, 260 U. S. 393, 43 S. Ct. 158, 67 L. Ed. 322, 28 A. L. R. 1321, Mr. Justice Holmes, who spoke for the majority in the housing cases, said that those cases went "to the verge" of what was permissible under the constitutional limitations. To uphold House Bill No. 231 would require going beyond the verge.

There is no contention that the real estate mortgage business has become a public service agency, and therefore subject to regulation. In fact, there is no attempt made in the act to regulate the mortgage business. The law is made to apply only to contracts existing prior to the effective date of the act, and there is no regulation with reference to future contracts.

■ In the emergency clause the act states that a great emergency exists which will cause many individuals great losses unless foreclosures are stayed. The act itself does not contain a preamble; it does not justify its provisions by setting forth the facts constituting the emergency. It does set forth the existence of an emergency which it says is sufficient to justify suspending the constitutional rule requiring a bill to be read on three several days, etc. However, this court knows as a matter of common knowledge that there exists a great depression and that economic conditions generally are bad, and we further know that conditions now are no worse than they were on March 31, 1932, the date on which appellant signed the note which is the basis of this suit, and which conditions were no doubt realized fully by all parties at the time the contract was entered into.

If House Bill No. 231 can be held to be valid on the ground that the police power is superior to the inhibitions in the Constitution, then another moratorium law can be upheld staying such sales for another year. If moratorium law No. 4 is valid, why would not moratorium law No. 5 be valid, and thus moratorium laws could be passed and real estate sales stayed so long as the emergency continues, be that for a short while or for many years? Such a doctrine would make the Legislature and the courts the judges of when an emergency is of sufficient magnitude to justify setting aside the provisions and inhibitions contained in the Bill of Rights. Such was never the intention of the founders of our Constitution. When they wrote into our Bill of Rights (Const. art. 1, § 29), " * * * We declare that everything in this 'Bill of Rights' is excepted out of the general powers of government, * * *" they meant exactly what they said. When they said such powers were taken out of the general powers of government, they meant they were taken out of the police power of the government.

If the people are dissatisfied with what they have placed in their Bill of Rights, they have the power to change its provisions. If they are dissatisfied with the provisions of the United States Constitution, they can repeal them, as they are now attempting to do with the Eighteenth Amendment. But, so long as the people who are the sovereign power in the government permit these provisions to stand, it is the duty of the courts to see that such inhibitions are not violated and to declare all laws which directly conflict with such provisions of our organic law to be null and void.

■ We recognize that, where the Legislature has passed a law, every intendment and presumption is in favor of its constitutionality, and that we should not declare an act of the Legislature void unless its unconstitutionality be made to appear beyond any reasonable doubt. Koy v. Schneider, 110 Tex. 369, 218 S. W. 479, 221 S. W. 880.

The provisions of House Bill No. 231, which attempt to permit the staying of trustee sales provided for in deeds of trust, are plainly unconstitutional beyond any reasonable doubt, and we therefore declare such provisions to be void and of no effect. The judge below properly refused to grant the injunction, and his order to that effect will be here upheld, and in all things affirmed.