. The opinion of the Court was delivered by
Dtjnkin, C. J.
On 21 December, 1861, the Legislature of South Carolina passed an Act entitled “An Act to extend relief to debtors, and to prevent the sacrifice of property at public sales.”
By the first section it is provided that “ it shall not be lawful for any officer of this State to serve or execute any mesne or final process of any of the Courts of this State for the collection of money, until after the expiration of the first session of the next General Assembly of this State, except in the cases hereinafter specially provided.” This Act was renewed in February and December, 1863 ; again in December, 1864; and in December, 1865, it was continued in force until the adjournment of the next regular' session of the General Assembly. But, by the second section of the last-mentioned Act, it was declared that nothing therein contained should be construed to apply to any causes of action which might thereafter originate; nor should any debtor be entitled to the benefit of the Act who should fail, on three months’ previous notice, to pay his creditor, on or before 1st December, 1866, one-tenth of the aggregate amount *507 due at the time of demand; and, on such failure, the creditor was authorized to proceed to judgment and execution, but that no execution should be enforced for more than one-tenth, as aforesaid, during the continuance of the Act. Similar provision was made in regard to any debtor on final process at the time subsisting.
The case first entitled is that of a rule on the Sheriff to show cause why he had failed to serve the writ. The second case was a motion, on behalf of the defendant, to set aside the service of the writ. The cause shown by the Sheriff was, that the original cause of action was a money bond, executed in February, 1860, and he relied on the prohibition in the Acts above recited as the justification of his refusal to serve the process. The cause of action in the second case was a due bill, payable on demand, in 1860.
The rule against the Sheriff was discharged, and the service of the writ in the latter case was set aside by order of the Circuit Court.
An appeal was taken, ppon the following ground:
Because the Act of December, 1861, entitled “An Act to extend relief to debtors and to prevent the sacrifice of property at public sales,” as also the Act of 21st December, 1865, entitled “ An Act to amend the law known as the Stay Law,” impair the obligation of contracts existing at the time of the passage of said Act, are repugnant to the Constitution of the United States and of this State, and are unconstitutional and void.
The cases were transferred from the Court of Appeals to the Court of Errors, as the highest tribunal in the State, for final adjudication.
By Section 10, Article 1, Constitution United States, passed 17th September, 1787, it is declared that “no State shall enter into any treaty, alliance or confederation, grant letters of marque and reprisal; coin money; emit bills of credit; make any thing but gold and silver coin a tender in payment of debts ; pass any bill of attainder, ex post-facto law, or law impairing the obligation of contracts.” So, in the Constitution of the State *508 of South Carolina, adopted 3d June, 1190, Section 2, Article 9, it is declared, “nor shall any bill of attainder, ex post-facto law, or law impairing the obligation of contracts, ever be passed by the Legislature of this State.” A prohibition in the same terms is adopted in the Constitution of this State of September, 1865. (Article 9, Section 2.) It is necessary to determine what is “the obligation of a contract” as a preliminary to the inquiry, whether it has been impaired by State legislation. The distinction between the contract itself and the obligation is thus stated in Sturges vs. Crowninshield, (4 Wheat. 197 :) “A contract is an agreement by which a party undertakes to do or not to do a particular thing. The law binds him to perform his engagement, and this is the obligation of the contract.” In the argument of that cause, Mr. Hunter remarked that “the Judges of the State Courts and of this Court have confessed that there is, in these words — ‘ impairing the obligation of contracts ’ — an inherent obscurity. They are not taken from the English common law, or used as a classical or technical term of our jurisprudence in any book of authority. Were thejr furnished from that great treasury and reservoir of rational jurisprudence, the Roman law ? We are inclined to believe this. The tradition is that Mr. Justice Wilson, who was a member of the Convention, and a Scottish lawyer, and learned in the civil law, was the author of the phrase.” Whatever may be the correctness of the tradition, the term “ obligation ” is certainly recognized familiarly by the Roman jurists as denoting the legal tie which imposes a necessity of doing, or abstaining from, a particular act, as distinguished from the imperfect obligation arising from gratitude, charity, or other moral duties, binding upon conscience, -but having- no legal remedy for their enforcement. This latter is the essence of the legal obligation. Sub hac condilione, si volam, nulla fit obligatio. (Corpus Juris, Book 44, Chapter T, Lex. 8.) According to the Roman law, where the right of action is destroyed, the legal obligation ceases to exist. Gum nulla subest causa constat non posse constituí obligationem. (Corpus Juris, Book 2, Chapter 14, L. I, § 2-4 de pactis.)
In Ogden vs. Saunders, 12 Wheat. 213, it i's said, “the obliga *509 tion. of a contract, as spoken of in the Constitution, is a legal, not a mere moral obligation; it is the law which binds the party to perforin his undertaking. The obligation does not inhere or subsist in the contract itself proprio vigore, but in the law applicable to the contract; and this law is not the universal law of nations, but it is the law of the State where the contract is made. Any law which enlarges, abridges, or in any manner changes the intention of the parties resulting from the stipulations in the contract, necessarily impairs it.” Adverting to these principles, Mr. Justice Trimble, who acted with the majority of the Court, thus expresses himself: “The great principle intended to be established by the Constitution was the inviolability of the obligation of contracts as the obligation existed, and was recognized by the laws in force at the time the contracts were made.” “ Whether the law professes to apply to the contract itself, or to regulate the remedy, it is equally within the true meaning of the Constitution, if it, in effect, impairs the obligation of existing contracts. I do not mean to say that every alteration of the existing remedies would impair the obligation of contracts; but I do say, wdth great confidence, that a law taking away all remedy from existing contracts would be manifestly a law impairing the obligation of contracts. On the other hand, a great variety of instances may readily be imagined in which the Legislature of a State might alter, modify or repeal existing remedies, and enact others in their stead, without the slightest ground for a supposition that the new law impaired the obligation of contracts. If there be intermediate cases of a more doubtful character, it will be time enough to decide them when they arise.” In Mather vs. Bush, 16 John. R. 233, Chief Justice Spencer commented on the case of Sturges vs. Crowninshield, then recently decided. He said he bowed to the supremacy of the Supreme Court of the United States upon the point actually decided, Viz., the limited power of a State Legislature to pass bankrupt laws.- But in reference to the distinction taken between “a case impairing the obligation of a contract and operating directly upon it, and a law affecting or modifying the remedy upon the contract, and that the latter is under the control of the *510 legislative power of a State,” lie proceeds thus: “And, although we may not feel the full for'ce of the distinction, it does not become us to analyze the opinion, or to reason upon it any farther than to observe that the remedy is essential, in many cases, to the contract; and to modify it, so as to frustrate the contract or render it less valuable, must have the indirect effect to impair its obligation.” The criticism of this distinguished jurist, thus respectfully intimated in 1819, has been vindicated by time and experience; and the manifest impracticability of preserving inviolate the obligation of the contract, and recognizing at the same time an uncontrolled power of State legislation ovár the remedy, thus pointed out by Chief Justice Spencer, has been felt and recognized by text writers as well as judicial authorities for the last forty years..
Chancellor Kent says: “To deny any remedy under a contract, or by burdening the remedy with new conditions and restrictions to make it useless or hardly worth pursuing, is equally a violation of the Constitution.” Again : “The better doctrine is, that all effectual remedies affecting the interests and rights of the owner, existing when the contract was made, become an essential ingredient in it, and are parcel of the creditor’s right, and ought not to be disturbed. All suspensions by statute of remedies, existing when the contract was made, is more or less impairing its obligation.” (1 Kent Com. 419.)
Mr. Justice Story uses this language: “When we speak of the obligation of a contract, we include in the idea some known means acknowledged by the municipal law to enforce it. Where all such means are denied, the obligation of a contract is understood to be impaired, though it may not be completely annihilated.” (Story Const. § 1381.)
Mr. Sedgwick says: “Looking at a contract legally and practically as an instrument by which rights of property are created, and on which they repose, obligation and remedy are strictly convertible terms. Take away the whole remedy, and it is admitted the contract is gone. And it seems the only logical rule to hold,-that any legislation which materially diminishes the remedy given by the law to the creditor at the time his contract *511 is made, just so far impairs the obligation of the contract.’’ (Stat. and Const. Law, p. 652.)
The alleged distinction between the right and the remedy was pressed upon the Court in Green vs. Biddle, 8 Wheat. 381. It was a case twice elaborately argued, and well considered. Mr. Justice Washington, speaking for the Court, says : “A right to land includes the right to enter upon it — to recover possession where withheld.” Again: “Nothingcan beráore clear upon the principles of law and reason than that a law which denies to the owner of land a remedy to recover the possession of it when withheld by any person, or which clogs his recovery of such possession by conditions and restrictions tending to diminish the value of the thing recovered, impairs his right to, and interest in, the property. If there be no remedy to recover the possession, the law necessarily presumes a want of right to it. If the remedy afforded be qualified and restrained by conditions of any kind, the right of the owner may indeed subsist, but it is impaired and rendered insecure, according to the nature and extent of such restrictions.” Twenty years afterwards, these principles came under review before the same Court, in Bronson vs. Kinzie, 1 How. 311. This latter case arose under what was called “the valuation law” of the State of Illinois. The opinion was delivered by Chief Justice Taney. He says: “ Whatever belongs merely to the remedy may be altered according to the will of the State, provided the alteration does not impair the obligation of the contract. But, if that effect is produced, it is immaterial whether it is done by acting on the remedy or directly on the contract itself. In either case, it is prohibited by the Constitution.” He then adverts to the case of Green and Biddle, and repeats the emphatic language there used by the Court: “ It is no answer that the Acts of Kentucky, now in question, are regulations of the remedy and not of the right to the lands.” “If these acts so change the nature and extent of existing remedies as materially to impair the rights and interests of the owner, they are just as much a violation of the compact as if they directly overturned his rights and interests.” “ We concur entirely,” adds the Chief Justice, “in the correctness of the rule *512 above stated. It is difficult, perhaps, to draw a line that would be applicable to all cases between legitimate alterations of the remedy and provisions which, in the form of remedy, impair the right. But it is manifest that the obligation of the contract, and the rights of a party under it, may, in effect, be destroyed by denying a remedy altogether; or may be seriously impaired by burdening the proceedings with new conditions and restrictions, so as to make the remedy hardly worth pursuing.” He then cites the authority of Mr. Justice Blackstone : “ The remedial part of the law is so necessary a consequence of the declaratory and directory parts, that laws must be very vague and imperfect without it. For in vain would rights be declared, in vain directed to be observed, if there were no method of recovering and asserting those rights, when wrongfully withheld or invaded. This is what we mean properly, when we speak of the protection of the law.” (1 Black. Com. 55.) “It is that part of the municipal law,” (the remedial part,) continues the Chief Justice, “ which protects the right, and the obligation by which it enforces and maintains it. It is this protection which the clause in the Constitution now in question mainly intended to secure. And it would be unjust to the memory of the distinguished men who framed it, to suppose that it was designed to protect a mere barren and abstract right, without any practical operation upon the business of life. It was undoubtedly adopted as a part of the Constitution for a great and useful purpose. It was to maintain the integrity of contracts, and to secure their faithful execution throughout the Union, by placing them under the protection of the Constitution of the United States. And it would but ill become this Court, under any circumstances, to depart from the plain meaning of the word used, and to sanction a distinction between the right and the remedy, which would render this provision illusive and nugatory, mere words of form, affording no protection, and producing no practical result.” He then applies these principles : “ The mortgagee is entitled to the aid of this Court; for this purpose it is his absolute and undoubted right, under an ordinary mortgage deed, if the money is not paid at the appointed day, to go into the Oburt of Chancery and obtain *513 an order for the sale, &e. This is his right by the law of the contract; and it is the duty of the Court to maintain and enforce it without any unreasonable delay.” “ When this contract was made, no statute had been passed by the State changing the rules of law or equity in relation to a contract of this kind.” “ They were the laws of Illinois at the time; and, therefore, entered into the contract, and formed a part of it, without any express stipulation to that effect in the deed; and any subse- • quent law, impairing the rights . thus acquired, impairs the obligation which the contract imposed.” He then comments upon the Act of Illinois of February, 1841: “ The observations already made (sa_ys he) in relation to the other Act, apply with equal force to this. It is true that this law apparently acts upon the remedy, and not directly upon the contract. Yet, its effect is to deprive the party of his pre-existing right to' foreclose, etc.”
In the following year the same subject was discussed in McCracken vs. Hayward, 2 How. 609. The opinion of the Supreme Court was delivered by Mr. Justice Baldwin. “ The obligation of a contract (says he) consists in its binding force on the party who makes it. This depends on the laws in existence when it is made; these are necessarily referred to in all contracts, and forming a part of them as the measure of the obligation to perform them by the one party, and the right acquired by the other. There can be no other standard by which to ascertain the extent of either than that which the terms of the contract indicate, according to their settled legal meaning; when it becomes consummated, the law defines the duty and the right, compels one party to perform the thing contracted for, and gives the other a right to enforce the performance by the remedies then in force. If any subsequent law affect to diminish the duty, or to impair the right, it necessarily bears on the obligation of the contract, in favor of one party to the injury of the other; hence, any law which, in its operation, amounts to a denial or obstruction of the rights accruing by a contract, though professing to act only on the remedy, is directly obnoxious to the prohibition of the Constitution. This principle is so clearly stated and fully settled *514 in Bronson vs. Kinzie, that nothing remains to be added to the reasoning of the Court, or requires a reference to any other authority than as therein referred to.” Alluding to the particular case under consideration, “the obligation of the contract between the parties in this case (says Judge Baldwin) was to perform the promises and undertakings contained therein ; the right of the plaintiff was to damages for the breach thereof, to bring suit and obtain a judgment, to take out and prosecute an execution against the defendant till the judgment was satisfied, pursuant to the existing laws of Illinois. These laws giving these rights were as perfectly binding on the defendant, and as much a part of the contract, as if they had been set forth in its stipulations in the very words of the law relating to judgments and executions.” “Any subsequent law which denies, obstructs, or impairs this right, by superadding a condition to the sale, &c., affects the obligation of the contract, for it can be enforced only by a sale of the defendant’s property, and the prevention of such sale is the denial of a right. The same power in a State Legislature maybe carried to any extent, if it exists at all.” “ If the power can be exercised to any extent, its exercise must be a matter of uncontrollable discretion, in passing laws relating to the remedy which are regardless of the effect on the right of the plaintiff. This -was the ruling principle of the case of Bronson vs. Kinzie.” The law of Illinois, prohibiting a sale under execution for less than two-thirds of the appraised value, was held to be unconstitutional and void.
In Planters’ Bank vs. Sharp, 6 How. 301, and again in Curran vs. State of Arkansas, 15 How. 319, these principles were reaffirmed. In the former case, Mr. Justice Woodbury says: “ One of the tests that a contract has been impaired is, that its value has, by legislation,- been diminished. It is not, by the prohibition of the Constitution, to be impaired at all. This is not a question of degree, or manner, or cause, but of encroaching in any respect on its obligation, dispensing with any part of its force.” (P. 321.) In the latter case (15 How.) the doctrine is well condensed by Mr. Justice Curtis: “ It by no means follows, because a law affects only the remedy, that it does not impair *515 the obligation of ,a contract. The obligation of a contract, in the sense in which these words are used in the Constitution, is that duty of performing it which is recognized and enforced by the laws; and if the law is so changed that the means of enforcing this duty are materially impaired, the obligation of the contract no longer remains the same.”
This last case was decided A. D. 1853; and so lately as December, 1864, in Hawthorne vs. Calif, 2 Wallace, 10, the Supreme Court of the United States, by Mr. Justice Nelson, took occasion to recognize and re-afflrm “the principle decided in Bronson vs. Kinzie, and the several subsequent cases of this class;” and held that the Acts then under consideration so seriously affected the remedy of the mortgagee as to impair the obligation of the mortgage contract within the meaning of the Constitution, and declared them void.
It would seem superfluous to add that this series of decisions by the Supreme Court of the United States is conclusive upon this tribunal in settling the. construction of the Constitution upon this subject.
But we are not left without the light of instruction from the adjudications of our sister States, During the war of 1812, when the people of our country were greatly harassed in their affairs, the Legislature of North Carolina passed an Act staying execution upon judgments until the first term of the Court after February, 1814, upon the defendant giving security, &c. The Supreme Court of North Carolina held the law to be null and void, as violating the prohibition of the Constitution against impairing the obligation of contracts. (Crittenden vs. Jones, 1 Car. Law Rep. 385.) That case came under review before the same tribunal in the case of Barnes vs. Barnes, decided June and August term, 1861. The opinion of the Court was announced by Chief Justice Pearson: “ The plea (says he) claiming for the defendants the benefit of what is commonly called the Stay Law, presents for our decision the question of the constitutionality of an Act of the last session of the General Assembly, entitled ‘ An Act to provide against the sacrifice of property, and to suspend proceedings in- certain cases.' Our province is *516 to give judgment on the question of the constitutional power of the Legislature to pass the statute. In the discharge of this doty, we are relieved by the fact that a question of such importance is not now presented for the first time, so as to put upon us the responsibility of making a decision on the strength of our own convictions ; for we find that the line has been plainly marked, in fact, ‘blazed out,’by many previous adjudications, so that it can be easily followed; and all we have to do is to make an application of well-established principles.” “ Our opinion is, that the statute under consideration, so far as it opposes the right of the plaintiff to a judgment in the Court below, or the motion for a judgment in this Court, and for execution, is void and of no effect, because it is in violation of the Constitution of the United States, &c. 1st. It is patent, by the face of the statute, that it does impair the obligation of contracts. This is settled in Jones vs. Crittenden, 1 Car. Law J. 385. In that case, the argument is exhausted, and we only add, we concur in it.”
Lapsley vs. Brashears is a case from Kentucky, 4 Litt. Rep. 49. The' Legislature had authorized a stay of execution on judgments obtained prior to the Act, for one year, upon the defendant’s giving bond to replevy, &c. The Court declared the Act null and void, as violating the prohibition of the Constitution. The opinion of Mr. Justice Owsley, speaking for the Court, is instructive: “But (says he) in a state of civil government, contracts may derive an additional obligation — an obligation which arises from the civil laws of the government, and which, but for the limitations contained in the Constitution, might have been impaired and totally annihilated by the Legislatures of the States. This obligation operates through- the medium of the sanction of the law, and consists emphatically in those remedies which the law supplies, and may be denominated the legal obligation.” “ The Act of the Legislature is in conflict with that provision of the Constitution of the United States which forbids any State from passing a law impairing the obligation of contracts.” “By the Act in question, it is true the obligation of the defendant’s prior contract has not been entirely *517 destroyed.” “But duiing the time of the replevin, which is allowed, by the Act, all pre-existing remedies upon the prior contract are suspended, and the obligation of the contract thereby weakened and impaired. To be in conflict with the Constitution it is not necessary that the Act of the Legislature should import an actual destruction of the obligation of the contract; it is sufficient if the Act imports an impairment of the obligation. If, by the legislative Act, the obligation of the contract be in any degree impaired, or, what is the same thing, if the obligation be weakened or rendered less operative, the Constitution is violated and the Act so far inoperative.”
In the State of Mississippi, the doctrine is thus stated in Briscoe vs. Anketell, 28 Miss. R. 371: “ It is too well settled to admit of question at the present day, that it is within the power of the State Legislature to regulate the remedy and modes of proceeding in relation to past as well as to future contracts. This power is subject only to the restriction that it cannot be exercised so as to take away all remedy upon the contract, or to impose upon its enforcement new burdens and restrictions which materially impair the value and benefit of the contract.”
But the case of Coffman vs. Bank of Kentucky is a recent decision of the Supreme Court of Mississippi. The Legislature of Mississippi had passed Acts, in 1861 and 1865, not unlike those passed in the same years by the General Assembly of South Carolina. By the Act of 1865, all laws for the collection of debts, &c., were suspended until 1st January, 1868. Chief Justice Handy delivered the judgment of the Court. After admitting in the most ample terms the general authority of State legislation in regard to the remedy for the enforcement of contracts, and vindicating this authority as sanctioned by previous adjudications — “but (continued he) this power of the Legislature over remedies is not without restriction, and any legislation which impairs the value and benefit of the contract, though professing to act upon the remedy, must impair the right intended to be secured by the contract, and come within the evil intended to be prohibited by the Constitution. For, though the particular remedy existing at the time of making the contract *518 is not an essential part of it, yet no contract would be of any value without a remedy to enforce it. Its obligation would be nugatory, if all remedy to enforce it were taken away, and it would be impaired, if the remedy were obstructed and rendered impracticable. The remedy is, therefore, an incident to the contract, and though the party may have no right, under the contract, to any particular remedy, yet he has a right, at all times, to some adequate and available remedy to enforce it, and that is manifestly within the contemplation of the contract. Hence, it has been held generally by Courts and jurists of the highest authority in this country that Acts of the Legislature, preventing all legal remedies on contracts, or so changing and obstructing them as materially to impair the value and benefit of the contract as it existed when made, are violations of the contract, and within the prohibitions of the Constitution of the United States.” Subsequently analyzing the provisions of the Act of 1865, the Chief Justice says: “It is urged that it is within the legitimate powers of the Legislature, because it appertains to the remedy. But is that its true character ?” “ It does not attempt to make any new regulations in relation to the prosecution of suits then pending, or any proceedings to be hád therein, but absolutely prevents all proceedings in such suits for more than two years. Instead of modifying the remedies existing for the cause of action specified, or providing- any new remedies thereon, it takes away all'remedies, and closes the Courts upon all remedies upon them for a period exceeding two years. This can with no propriety be classed or justified as legislation regulating remedies, but is in effect a denial of all remedy for the time specified. It is, therefore, clearly within the principles above stated, and comes within the prohibition of the Constitution of the United States.”
While preparing this opinion, a Montgomery newspaper furnishes the report of a decision made a few days since by the Supreme Court of Alabama. Ex parte G. F. Pollard and ex parte M. L. Woods.
It appears that in Alabama, as in South Carolina, the Circuit Courts are held at an interval of about six months. By the *519 former practice in Alabama, under the regulations of a law, as in South Carolina for half a century past, no judgment is regularly entered against the defendant until the second term. He was thus entitled to what may be called an imparlance. But by the code adopted in Alabama in 1853, the proceedings were expedited and judgment might be rendered at the first or return term. The law so continued until February, 1866, rrhen the Legislature passed an Act “to regulate judicial proceedings.” By one of the provisions, a defendant became entitled to what may be termed a second imparlance, and judgment would be entered at six or twelve months, according to the service of the writ. By another provision, after judgment, the execution might be superseded by what is called “ a suggestion of irregularity.” The Supreme Court consists of a Chief' Justice and two associates. All united in holding the law unconstitutional and void, so far as it stayed or hindered the collection of money under the judgments rendered. But the two associate Justices thought the other provision strictly a regulation of the remedy ; that, as the Code of 1853 had taken away the imparlance without any impeachment of its constitutionality, so the Act of 1866, which gave a second imparlahce, might be sustained in the same view. Mr. Justice Byrd, however, who concurred in this respect with his associate, took the occasion to express his condemnation of "Stay Laws.” “The Act in question (says he) is said to be of that class. It is not so styled, by the General Assembly in the Act; and, being a co-ordinate branch of the government, it is proper to attribute to its action the best motives and objects that could be reasonably presumed;” and agrees with his associate that it was merely a regulation of the proceedings. Chief Justice Walker, in a very elaborate judgment, pronounced the entire Act a violation of the Constitution. He said that the first provision was manifestly “ a mere plan for the delay and postponement of the performance of contracts, and not an adjustment of the machinery of the Courts to the attainment of a fair trial, or to the security of j ustice. ” “ I can perceive (adds he) no ground upon which the convictions of the Legislature as to the welfare of the State or *520 the necessities of the people can enlarge their authority to interfere, through the manipulation of the remedy, with the obligation of contracts.”
It is manifest that the judgment of the Alabama Court forms no exception to the unbroken current of decisions. But surely no “ doubtful interpretation ” can be alleged against the legislation of South Carolina upon this subject. The General Assembly said what they meant. It is their habit to do so. They call things by their right names. The Act of 1861 is entitled “An Act to extend relief to debtors, and to prevent the sacrifice of property at public sales.” The subsequent annual enactments are entitled “An Act to continue in force” (the Act of 1861.) " But the Act of 1865 anticipates any misconception, andis entitled “An Act to amend the law known as the Stay Law.” In the case first stated (the State vs. Carew) the obligation of the bond required the obligor to pay to the obligee $1,011 on the 1st February, 1861. The A°t of December, 1861, precludes the creditor from any legal remedy whatever to enforce his demand for twelve months. This prohibition is renewed and continued by successive enactments until December, 1865, when the law was so altered as to allow the creditor, after three months’ previous notice to the debtor, to demand payment of one-tenth of his debt on the 1st December, 1866 ; and, on non-payment, he was allowed to obtain judgment and enforce the same for one-tenth of his debt, and no more. The plain, open, and avowed purpose of the General Assembly was not the regulation of judicial proceedings, but a modification or amelioration of the obligation of the parties — “to extend relief to debtors” — “to prevent the sacrifice of property at public sale” — to amend the “ Stay Law.” By the manifest and necessary effect of the legislation, the creditor is reduced to the condition in which (as has been elsewhere said) “his rights live but in grace, and his remedies in entreaty only.”
It may be that in great emergencies, in periods of general embarrassment, this extraordinary power of interfering for the relief of the citizen ought to have been reserved to the State Legislatures.
*521 It remains only to inquire whether this particular matter was not fully considered by the framers of the Constitution. When Luther Martin, a delegate from Maryland, returned to his constituents, he was opposed to several provisions of the Constitution which had been adopted, and thus expresses his dissatisfaction with the clause prohibiting the States from passing any law impairing the obligation of contracts: “I considered (said Mr. Martin) that there might be times of great public calamity and distress, and of such extensive scarcity of specie, as would render it the duty of the government, for the preservation of even the most valuable part of its citizens, in some measure to interfere in their favor by passing laws totalljq or partially, stopping Courts of justice, or authorizing the debtor to pay by instalments, or by delivering up his property to his creditors at a valuation, &c. Such times have been and may again arrive. I therefore voted against depriving the States of this power.’’ (1 Elliott’s Deb. 316.)
Mr. Madison, in the introduction of his report of the debates on the Federal Constitution, describing the condition of things which led to the assembling of sucha Convention, says: “In the internal administration of the States, a violation of contracts had become familiar in the form, of depreciated paper made a legal tender, of property substituted for money, of instalment laws, and of the occlusion of Courts of justice, although evident that all such interferences affected the right of other States, • relatively creditors, as well as citizens creditors within the States.” (Madison Papers, p. 120, 5 Ell. Deb.)
General Davie, of North Carolina, returning from the Convention, congratulated his constituents on the adoption of this prohibition of the Constitution. That, hereafter, a sister State could not again do what they had heretofore done — “make Pine Barren Acts to discharge their debts; declare that our citizens shall be paid in sterile, inarable lands, at an extravagant price; pass instalment laws, procrastinating the payment of debts due from their citizens for years.” “ It is essential (said he) to the interests of agriculture and commerce that the hands of the State should be bound from making paper money, Instalment Laws, *522 and Pine Barren Acts.” “ That section is the best in the Constitution. It is founded in the strongest principles of justice. It is a section, in short, which I thought would have endeared the Constitution to this country.” (4 Ell. Deb. 15Y, 159, 191.)
Mr. Charles Pinckney, of South Carolina, was a member of the Convention which adopted the Constitution of the United States, in 1Y8Y. He was subsequently a member of the Convention which formed the State Constitution of 1Y90, and is said to have prepared the draft of the Constitution of South Carolina. In the debates of the State Convention, commenting on this clause of the Constitution of the United States, (Article 1, Section 10,) Mr. Pinckney said: “This section I consider as the soul of the Constitution; as containing, in a few words, those restraints upon the States which, while they keep them from interfering with the powers of the Union, will leave them always in a situation to comply with their Federal duties ; will teach them to cultivate the principles of public honor and private honesty, which are the sure road to national character and happiness.” The prohibition was reiterated in the State Constitution then adopted: “Nor shall any law impairing the obligation of contracts ever be passed by the Legislature of this State.” (Article 9, Section 2.)
The venerable Chancellor DeSaussure had walked with those who fought in the Revolution, and with those Avho framed the •Federal Constitution. The following is his note to Glaze vs. Drayton, (1 Des. R. 110:) “The Legislature, in consideration ■of the distressed state of the country after the war, had passed .an Act prohibiting the immediate recovery of debts, and fixing «certain periods for the payment of debts far beyond the periods fixed by the contract of the parties. These interferences with private contracts became very numerous with most of the State Legislatures, even after the distress arising from the Avar had ceased in a great degree. They produced distrust and irritation throughout the community to such an extent that new troubles were apprehended; and nothing contributed more to prepare the public mind for giving up a portion of the State sovereignty, *523 and adopting an efficient national government, than these abuses of power by the State Legislatures.”
In a similar strain, Mr, Justice Colcoclr speaks in Alexander vs. Gibson, 1 N. & McC. Rep. 186, (A. D. 1819:) “In giving construction to this part of the Constitution, it is necessary to take a view of the state of things which existed at the time of its adoption, and of the particular Acts which had been passed by many of the States during the struggle for our independence. From the difficulties which had arisen during the war, it was found to be impossible for debtors to satisfy the demands of their creditors. The value of property was diminished. There was little circulating medium in the country. And hence had originated ‘Pine Barren Acts,’ ‘Instalment Laws,’ and other Acts of similar character, impairing the obligation of contracts, and thereby destroying credit. Many of these laws were then-in operation, and to guard against the continuance of them was the avowed object of this clause in the Constitution.”
Such was the contemporaneous testimony; such has been the uniform tradition of the country. Laws of the character of those under consideration were precisely those against which the prohibition of the Constitution was directed. Perhaps our forefathers miscarried in judgment, and Luther Martin was right. But he failed to convince his constituents. The people of the several States acted with their eyes open. They set one thing over against another, and the counsels of General Davie, and Mr. Madison, and Mr. Pinckney, prevailed over the counsels of Mr. Martin and other distinguished patriots. They ratified the prohibition of the Constitution. They thus voluntarily submitted to this self-restraint, and determined to protect their representatives in the State Legislature from the perils of temptation. If there has been any authoritative adjudication, since the adoption of the Constitution, sustaining the validity of “ Instalment Laws ” or “ Stay Laws,” it escaped the research of the learned counsel who argued this cause, and has not been brought to the notice of the Court,
In Lindsay vs. Commissioners, 2 Bay, 61, Judge Waties uses this language: “It was painful to him to be obliged to question *524 the exercise of any legislative power. In exercising this high authority, the Judges claim no judicial supremacy; thejr are only the administrators of the public will. If an Act of the Legislature is held void, it is not because the Judges have any control over the legislative power, but because the Act is forbidden by the Constitution, and because the will of the people, which is therein declared, is paramount to that of their representatives expressed in an3^ law. As the Act under consideration was repugnant to this high will, he was bound to say that it ought not to have any operation. ”
In the judgment of this Court, the provisions of the Acts of 1861 and 1865, which interdict the service of mesne process, or the enforcement of final process, are at variance with the article of the Constitution of the United States which prohibits a State from passing any law impairing the obligation of contracts, and such provisions are, consequently, inoperative and void.
Wardlaw, Glover, Munro, Inqlis, Moses, and Dawkins, J. J., and Carroll, Lesesne, and Johnson, C. C., concurred.