# JULY TERM, 1895.

PRESENT:

Hon. DAVID MARTIN, Chief Justice.
Hon. WILLIAM A. JOHNSTON, } Associate Justices.
Hon. STEPHEN H. ALLEN,

JOHN L. BEVERLY v. MARTHA BARNITZ.

OBLIGATION OF CONTRACTS—*Redemption Law, Constitutional.*
Chapter 109, Laws of 1893, commonly known as the "redemption law," whether applied to existing or future contracts, is not in conflict with the provision of the federal constitution (article 1, § 10,) that "no state shall . . . pass any . . . law impairing the obligation of contracts."

*Motion for Rehearing.*

THE nature of the action and the material facts appear in *Beverly v. Barnitz,* ante, p. 451, and in the opinion herein, filed December 7, 1895.

*E. A. McMath,* for plaintiff in error.
*William J. Scott,* for the motion.
*Ferry & Doran,* contra.

The opinion of the court was delivered by

MARTIN, C. J.: On November 1, 1885, George A. Kirkland executed a negotiable promissory note to Martha Barnitz for $1,500, payable in five years, with interest at 8 per cent. per annum, and after maturity at the rate of 12 per cent. per annum, which note was secured by a mortgage on a quarter-section of land in Shawnee county, Kansas, appraisement being waived.

The land was afterward sold to John L. Beverly, subject to the mortgage. On January 21, 1893, an action was commenced in the district court of Shawnee county to obtain judgment upon said note and to fore-close said mortgage. On July 7, 1893, a personal judgment was rendered for $2,113.46, bearing interest from that date at the rate of 12 per cent. per annum, and $44.95 costs, and the land was ordered to be sold for the payment of said judgment. On January 9, 1894, an order of sale was issued, and the property was sold to Martha Barnitz by the sheriff on February 12, 1894, for $2,000. On February 19, 1894, John L. Beverly filed a motion asking that, upon confirmation of the sale, the court order, adjudge and determine that said real estate is subject to redemption as provided by chapter 109 of the Laws of 1893, (which took effect March 17, 1893,) and that the sheriff be ordered and directed to make to the purchaser the certificate of sale mentioned in said chapter, he being in actual possession of said real estate by his tenant, the same never having been abandoned, but being occupied in good faith. · This relief was refused by the court, and it was ordered that the sale be confirmed and a deed executed by the sheriff to the purchaser for said premises, holding that said chapter 109 is unconstitutional so far as intended to apply to mortgages previously executed and delivered. On a proceeding in error in this court, said judgment was affirmed. The companion case of *Watkins v. Glenn* was decided at the same time, and the opinions appear ante pp. 417 *et seq.* (40 Pac. Rep. 316–326). The plaintiff in error asks a rehearing.

Does this statute impair the obligation of this prior contract? If it does so in the slightest degree it must be held unconstitutional as to such contract. If, on

the other hand, the act affects only the remedy, or some provision of the contract which is inoperative and void under the laws of Kansas where the contract was made, then it must be held valid; and all legal presumptions, so far as this court is concerned, favor the validity of the act. (Cooley, Const. Lim. 216, 217). When Chief Justice Marshall delivered the opinion of the supreme court of the United States in *Sturges v. Crowninshield*, 4 Wheat. 122, the learning upon the inhibition "No state shall . . . pass any . . . law impairing the obligation of contracts" was well-nigh exhausted. Little was left for other or subsequent judges of that tribunal but to apply the law as there clearly laid down. The legislature of New York had in 1811 enacted an insolvent law which not only purported to liberate the person of the debtor, but to discharge him from all liability for any debt contracted previous to his discharge, on surrendering his property in the manner prescribed by the act; and it was held that, in so far as it purported to discharge a debtor from his obligation without performance, it was invalid, but not so as to releasing the debtor from imprisonment, then a common and very persuasive remedy. The court says (p. 197):

"A contract is an agreement in which a party undertakes to do, or not to do, a particular thing. The law binds him to perform his undertaking, and this is, of course, the obligation of his contract. In the case at bar, the defendant has given his promissory note to pay the plaintiff a sum of money on or before a certain day. The contract binds him to pay that sum on that day; and this is its obligation. Any law which releases a part of this obligation must, in the literal sense of the word, impair it. Much more must a law impair it which makes it totally invalid and entirely discharges it."

And again (pp. 200, 201):

"The distinction between the obligation of a contract and the remedy given by the legislature to enforce that obligation has been taken at the bar, and exists in the nature of things. Without impairing the obligation of the contract, the remedy may certainly be modified as the wisdom of the nation shall direct. Confinement of the debtor may be a punishment for not performing his contract, or may be allowed as a means of inducing him to perform it; but the state may refuse to inflict this punishment, or may withhold this means, and leave the contract in full force. Imprisonment is no part of the contract, and simply to release the prisoner does not impair its obligation."

See, also, *Mason v. Haile*, 12 Wheat. 370; *Beers v. Haughton*, 9 Pet. 329, 359; *Penniman's Case*, 103 U. S. 714, 717.

In *Bronson v. Kinzie*, 1 How. 311, 315, 316, the court, speaking through Chief Justice Taney, in respect to an Illinois mortgage, said:

"If the laws of the state passed afterwards had done nothing more than change the remedy upon contracts of this description, they would be liable to no constitutional objection, for, undoubtedly, a state may regulate at pleasure the modes of proceeding in its courts in relation to past contracts as well as future. It may, for example, shorten the period of time within which claims shall be barred by the statute of limitations. It may, if it thinks proper, direct that the necessary implements of agriculture, or the tools of the mechanic, or articles of necessity in household furniture, shall, like wearing apparel, not be liable to execution on judgments. Regulations of this description have always been considered in every civilized community as properly belonging to the remedy, to be exercised or not by every sovereignty, according to its own views of policy and humanity. It must reside in every state to enable it to

secure its citizens from unjust and harassing litigation, and to protect them in those pursuits which are necessary to the existence and well-being of every community. And, although a new remedy may be deemed less convenient than the old one, and may in some degree render the recovery of debts more tardy and difficult, yet it will not follow that the law is unconstitutional. Whatever belongs merely to the remedy may be altered according to the will of the state, provided the alteration does not impair the obligation of the contract. But if that effect is produced, it is immaterial whether it is done by acting on the remedy or directly on the contract itself. In either case it is prohibited by the constitution."

In *Terry v. Anderson*, 95 U. S. 628, it was held that an enactment reducing the time prescribed by the statute of limitations in force when the right of action accrued is not unconstitutional, provided a reasonable time be given for the commencement of a suit before the bar takes effect. The court says (p. 633): "The parties to a contract have no more a vested interest in a particular limitation which has been fixed than they have an unrestricted right to sue."

In *Antoni v. Greenhow*, 107 U. S. 769, 774, 775, although the Virginia funding act of 1871 required the state to receive certain coupons for all taxes and demands due her, and authorized the writ of *mandamus* to compel the proper tax-collector to receive the same, yet the act of 1882, which required the coupon holder to first pay his taxes in cash and file his coupons in the court of appeals, and after a circuitous proceeding receive back his cash in lieu of the coupons, was held to affect only the remedy, and not to constitute an impairment of the contract.

In *Life Ins. Co. v. Cushman*, 108 U. S. 51, it was decided that the Illinois statute of 1879 entitling the purchaser, in case of redemption, to receive interest

upon his bid at the rate of 8 per cent. per annum (the previous law prescribing 10 per cent.) was applicable to all decretal sales of mortgaged premises thereafter made, although the mortgage was given before the passage of that statute ; that such reduction in the rate of interest did not impair the obligation of the contract between mortgagor and mortgagee, because the amendatory statute did not diminish the duty of the mortgagor to pay what he agreed to pay, or shorten the period of payment, or affect any remedy which the mortgagee had by existing law for the enforcement of his contract ; and that existing laws with reference to which the mortgagor and mortgagee must be assumed to have contracted are only those which in their direct or necessary legal operation controlled or affected the obligations of their contract.  And in the opinion the court says (pp. 64, 65) :

"The rights of the purchaser at the decretal sale, if one was had, were not of the essence of the mortgage contract, but depended wholly upon the law in force when the sale occurred.  The company ceased to be a mortgagee when its debt was merged in the decree, or at least when the sale occurred.  Thenceforward its interest in the property was as purchaser, not as mortgagee.  And to require it, as purchaser, to conform to the terms for the redemption of the property as prescribed by the statute at the time of purchase does not, in any legal sense, impair the obligation of its contract as mortgagee.  It assumed the position of a purchaser, subject necessarily to the law then in force defining the rights of purchasers."

And again the court says (p. 66):

"That the reduction of interest to be paid to the purchaser would lessen the probable number of bidders at the decretal sale, and thereby diminish the chances of the property bringing the mortgage debt, are plainly contingencies that might never have

arisen.   They could not occur unless there was a de-
cretal sale, nor unless the mortgagee became the pur-
chaser ;  and are too remote to justify the conclusion,
as matter of law, that such legislation affected the
value of the mortgage contract.''

In *Morley v. L. S. Rly. Co.*, 146 U. S. 162, it was
held that a state was not forbidden by the clause of
the federal constitution under consideration from leg-
islating, within its discretion, to reduce the rate of
interest upon judgments previously obtained in the
courts, the judgment-creditor having no contract
whatever in that respect with the judgment-debtor.
The court held that the state law regulating the rate
of interest on judgments formed no part of the con-
tract, and quoted approvingly (p. 171) from the opin-
ion of Chief Justice Marshall, in *Ogden v. Saunders*, 12
Wheat. 213, 343, as follows :

"If the law becomes a part of the contract, change
of place would not expunge the condition.   A contract
made in New York would be the same in any other
state as in New York, and would still retain the stip-
ulation originally introduced into it.''

In *Curtis v. Whitney*, 13 Wall. 68, the court held that
a statute which required the holder of a tax-sale cer-
tificate, made before its passage, to give three months'
notice, with a copy of the certificate, the name of the
holder, and the time the deed will be applied for, to
an occupant of the land, if there be one, before he
takes his tax deed, does not impair the obligation of
the contract evidenced by the certificate ;  and accord-
ingly a tax deed was adjudged void for want of the
notice.   Mr. Justice Miller, in delivering the unani-
mous opinion of the court, said (pp. 70, 71):

"That a statute is not void because it is retrospec-
tive has been repeatedly held by this court, and the

feature of the act of 1867, which makes it applicable to certificates already issued for tax sales, does not of itself conflict with the constitution of the United States, nor does every statute which affects the value of a contract impair its obligation. It is one of the contingencies to which parties look now in making a large class of contracts, that they may be affected in many ways by state and national legislation. For such legislation demanded by the public good, however it may retroact on contracts previously made, and enhance the cost and difficulty of performance, or diminish the value of such performance to the other party, there is no restraint in the federal constitution, so long as the obligation of performance remains in full force."

In each of the foregoing cases, except that cited from 1 How. 311, the supreme court of the United States held that the state statute enacted subsequently to the making of the contract affected the remedy only and not the obligation of the promisor to perform his contract, and other cases of like character might be cited. In some cases expressions have been used in the opinions of the judges which, if taken alone, would obliterate the line of demarkation between the obligation of the contract and the remedy for its enforcement; but, as was well said by Chief Justice Marshall, in *Ogden v. Saunders*, 12 Wheat. 333, "The positive authority of a decision is coextensive only with the facts on which it is made;" and opinions of judges are to be understood in the light of the issues to be decided, and as limited by them. Thus, in *Louisiana v. New Orleans*, 102 U. S. 203, Mr. Justice Field, in delivering the unanimous opinion of the court, said (pp. 206, 207) :

" The obligation of a contract, in the constitutional sense, is the means provided by law by which it can be enforced — by which the parties can be obliged to perform it. Whatever legislation lessens the efficacy

of these means impairs the obligation. If it tend to postpone or retard the enforcement of the contract, the obligation of the latter is to that extent weakened.''

But it was therein held that a state law requiring the registry in the office of the controller of judgments rendered against the city of New Orleans on former contracts, before any proceeding could be had for their enforcement, was a reasonable regulation and constitutional. The bonds in judgment were issued in 1854, and prior to the act of 1870 the judgment-creditor was entitled to the writ of *mandamus* to enforce collection. That act, however, purported to divest the courts of the state of authority to allow any summary process or *mandamus* against said city to compel payment, and required that judgment-creditors file transcripts of their judgments in the office of the controller, after which the judgments should be paid in the order of their registration. The supreme court of Louisiana held that this act was valid, and the plaintiff's case was dismissed and all relief denied, and this decree was affirmed by the supreme court of the United States. This decision is in line with *Curtis v. Whitney*, supra, where the holder of the tax deed was defeated because he did not comply with the subsequent state law requiring him to give to the occupant notice of the time when he would apply for a deed, together with a copy of the tax-sale certificate. The cases are in entire harmony, and yet it seems impossible to reconcile the propositions of the two great contemporary jurists who wrote the respective opinions; each concurring, however, in the opinion of the other. It is too much to expect perfect accuracy and clearness of doctrinal statement at all times, even from great judges.

*Edwards v. Kearzey,* 96 U. S. 595, involved the validity of the exemption clause in the North Carolina constitution of 1868. Under the prior statutes the exemptions to debtors in that state were quite limited, the provision of the new constitution being much more liberal, and it was held that this was unconstitutional as applied to prior contracts. Some expressions in the opinion of the court, delivered by Mr. Justice Swayne, might lead to the conclusion that no other or further exemptions were permissible than those existing at the date of the contract; but this would be a contradiction of the doctrines announced by the supreme court in prior and subsequent cases, and the concurring opinions of Justices Clifford and Hunt plainly show that the decision was placed upon the ground that the extension of the exemption was so large as to seriously impair the creditor's remedy for collection of his debt, Mr. Justice Clifford saying, "Beyond all doubt, a state legislature may regulate all such proceedings in its courts at pleasure, subject only to the condition that the new regulation shall not in any material respect impair the just rights of any party to the pre-existing contract." In the opinion, delivered by Mr. Justice Swayne, he says: "The remedy subsisting in a state when and where a contract is made and is to be performed is part of its obligation; and any subsequent law of the state which so affects that remedy as substantially to impair and lessen the value of the contract, is forbidden by the constitution of the United States, and therefore void." And this clause of the opinion is made the syllabus in the report of the case. It would be difficult to justify the first clause of this sentence by any decision of the supreme court, or upon any principle of general jurisprudence. We know

that the general remedies provided by our state laws do not form part of a contract, for if so they would necessarily be effective in any state or country where suit was brought to enforce the contract. ' It is a fundamental principle, not requiring in its support the citation of authorities, that the remedy is governed by the *lex fori*, and not by the *lex loci contractus*. A lawyer suing in the courts of this state upon a contract made in Louisiana, New York, or Illinois, would be thought reckless indeed if he should presume to ask remedies allowable under the laws of those states respectively, but not recognized here. The most that can be truthfully said is that each civilized state is under a moral obligation to afford to foreign or domestic creditors adequate remedies for the enforcement of their rights, but these are subject to change at any time, whether as to existing or future contracts. If by the last clause of the proposition it is meant that any substantial impairment of the contract is forbidden, certainly there can be no objection to it; but the value of a contract may be incidentally lessened by state legislation without impairing its obligation at all, as decided in many cases by the supreme federal tribunal.

In *Seibert v. Lewis*, 122 U. S. 284, the syllabus in *Edwards v. Kearzey*, supra, is quoted approvingly, but its principle was in nowise necessary to a decision of the case. By the act of March 23, 1868, the legislature of Missouri authorized the issue of bonds in payment of subscriptions to the stock of railroad companies, and therein stipulated that the county court should from time to time levy, and cause to be collected in the same manner as county taxes, a special tax in order to pay the interest and principal of any such bond, and it was held by the supreme court that it was a material part of this statutory contract that

such creditor should always have the right to a special tax, to be levied and collected in the same manner as county taxes, and that a subsequent act of the legislature which took away this right and gave in return no equivalent means of payment was an impairment of the contract.  There are other cases of like character, and certainly a creditor who takes the bond of a municipality upon the assurance of a statute which authorizes its issue and provides the means for its payment has a right to rely upon such statute as implicitly as upon the stipulation of the terms of payment in a private contract; but a bondholder would have no just cause to complain if the number of the terms of court should be reduced or the obtaining of an order of attachment rendered more difficult, or the law as to the appointment of receivers modified. Such matters do not enter into the contemplation of the parties in making a contract, so as to forbid a legislative change, nor follow the contract into other jurisdictions.  The correct doctrine is concisely stated in 3 American & English Encyclopedia of Law, 753, as follows :

"The remedy provided by law for the enforcement of a contract is no part of its obligation, and whatever pertains merely to the remedy may be changed, modified or abrogated by the legislature, in its discretion and to any extent, provided a substantive remedy be still left to the creditor, and such changes may constitutionally apply to existing contracts.  But if the parties to a contract include in it, in express terms, the remedy to be sought upon its breach, or the means to be used for securing its performance, subsequent legislation changing the remedial process they have agreed upon is, as to them, inoperative."

This brings us to a consideration of the change of our law as to the redemption of real estate.  Prior to 1893 lands could not be sold for less than two-thirds

of their appraised value, unless appraisement was waived in the mortgage or the bond or promissory note which it was given to secure ; but in case of such waiver the order could not issue for the sale of the lands until six months after the rendition of the judgment. Of course, the mortgagor might redeem at any time before actual sale by paying his debt, interest, and costs. By the act of 1893, the statutes requiring appraisement were repealed so that an order of sale may be issued at any time after the entry of judgment, and the land, after due notice, sold for whatever price it will bring. Upon confirmation, which may be had at any time after the sale when the district court is in session in the county, the creditor is entitled to the proceeds of the sale up to the amount of his judgment, interest, and costs. Under our practice, a personal judgment is rendered in the first instance for the full amount due, and if the proceeds of the sale are insufficient to pay the whole judgment-debt, interest, and costs, they are simply credited thereon so that it is unnecessary to obtain a judgment over as in the federal courts of equity, and a general execution may issue for the balance due. The act of 1893 does not operate upon the rights of the mortgagee until his claim as such has been extinguished, either wholly or to the full extent of the proceeds of the sale of the mortgaged property. The mortgagor, it is true, may redeem the land within a certain time by payment of the sale price and interest thereon ; but this is a matter wholly between him and the purchaser. If the mortgagee or judgment-creditor has deemed it best to become the purchaser, and thus voluntarily change his relation, it is difficult to see how he has any just cause of complaint. By the mortgage contract, the real estate was pledged for the

payment of the debt, subject to the equity of redemption. The state by its proper officer has at his instance sold the property for its payment, and after he gets the proceeds of the sale he has no further claim upon that property, although he may proceed by general execution to obtain any balance due by seizure and sale of other property.

"In this state the common-law attributes of mortgages have been by statute wholly set aside, and the ancient theories demolished. The mortgagee has a mere security creating a lien upon the property, but vesting no title, and giving no right of possession whatever, either before or after breach. The statute confines the remedy of the mortgagee to an ordinary action and sale of the mortgaged premises." (*Waterson v. Devoe*, 18 Kas. 223, 233.)

"In this state a real-estate mortgage conveys no estate or title, in whatever form the mortgage may be drawn; it creates only a lien upon the mortgaged property; and such a lien can be enforced only by a judgment or order of the district court. A holder of a real-estate mortgage cannot, even after condition broken, take possession of the mortgaged property, or of the rents or profits thereof, except by consent of all the parties, or by an action in the district court; and he cannot realize upon his mortgage except by judgment of such court. And this is true, whatever the form of the mortgage may be. . . . Where the mortgaged property is not a sufficient security for the mortgage debt, the district court may in some cases appoint a receiver to take charge of the mortgaged property, and to receive the rents and profits thereof, but in no case can the holder of the mortgage, without suit, and without the consent of the mortgagor or his assignee, take possession of either the real estate mortgaged or the rents or profits thereof." (*Seckler v. Delfs*, 25 Kas. 159, 165.)

The act of 1893 does not purport to repeal or modify § 254 of the code of civil procedure, (¶ 4349, Gen.

Stat. of 1889,) which authorizes the appointment of a receiver in a foreclosure case "where it appears that the mortgaged property is in danger of being lost, removed, or materially injured," or when "the condition of the mortgage has not been performed," and "the property is probably insufficient to discharge the mortgage debt." In such cases a receiver may be appointed at any time after the action is commenced, and the receivership may continue until the sale of the land by the sheriff, when the mortgagee's claim upon it is satisfied and extinguished, and as a creditor he has no further concern with it. The act of 1893 does not become operative until after the sale, and it matters not to the former creditor how the land is occupied during the period of redemption. Where appraisement is waived, as in this case, the mortgage creditor may now have a sale on request six months sooner than formerly. In certain contingencies, the purchaser may obtain a deed as soon after judgment as under the old law ; in others, he may be compelled to wait at most a year longer, but the redemptioner must pay interest in the meantime which is generally accounted an equivalent for use and occupation.

It may be said, however, that the creditor is prejudicially affected by this change of the law because purchasers may be unwilling to pay as high a price as before. But in this country land is not esteemed as in the old world. Here it is largely a subject of investment and speculation, and in many cases the purchaser would prefer a return of his money, with interest, to a deed for the land. A court could hardly say judicially that land would sell for less by reason of this change of the redemption law. Such considerations, like the lowering of the rate of interest to be paid by the redemptioner, are "too remote," as held

in *Life Ins. Co. v. Cushman*, supra, "to justify the conclusion, as matter of law, that such legislation affected the value of the mortgage contract."

A real-estate mortgage is not what it purports to be on its face anywhere. In Kansas it has been shorn of all its common-law incidents, as we have seen, and this is true in most of the other states. It may be stipulated in the mortgage that upon default of payment of principal or interest the mortgagee shall be entitled to possession of the mortgaged premises. It is vain. It may be solemnly agreed that in such case the rents and profits shall be applied toward the satisfaction of the debt and interest. It is as nothing. It may be provided that for any particular delinquency a receiver may be appointed. It is a waste of words. The mortgagor may even be driven by his necessities to bargain away in the mortgage his equity of redemption. Equity will treat it as void. For any such purpose the Kansas short form of mortgage, authorized by statute, (¶ 3886, Gen. Stat. of 1889) which contains not a word upon any of these subjects, is no less potent than the most tedious ironclad instrument ever devised by the wit, the cunning and the avarice of man. All such clauses are treated by the courts as if they were naught.

In *Clark v. Reyburn*, 8 Wall. 318, a decree of strict foreclosure was entered on a Kansas mortgage in the United States circuit court. There was no act of congress nor state statute nor rule of court forbidding this practice, nor purporting to give any time to redeem after foreclosure ; yet the supreme court reversed the decree, holding that as the ninetieth equity rule directs that the practice of the circuit courts shall be regulated, where no rule is applicable, by that of the high court of chancery in England, so far as it can be

applied consistently with the local circumstances and conveniences of the district where the court is held, and as, by the English practice, a period of at least six months was allowed for redemption, the decree, cutting off the mortgagor without time to redeem, was erroneous.   Mr. Justice Swayne, delivering the opinion, said ( pp. 321, 322):

"The equity of redemption is a distinct estate from that which is vested in the mortgagee before or after condition broken.   It is descendible, devisable and alienable like other interests in real property.   As between the parties to the mortgage the law protects it with jealous vigilance.   It not only applies the maxim 'once a mortgage always a mortgage,' but any limitation of the right to redeem, as to time or persons, by a stipulation entered into when the mortgage is executed, or afterwards, is held to be oppressive, contrary to public policy and void.   By the common law, when the condition of the mortgage was broken, the estate of the mortgagee became indefeasible.   At an early period equity interposed and permitted the mortgagor, within a reasonable time, to redeem upon the payment of the amount found to be due.   The debt was regarded by the chancellor, as it has been ever since, as the principal, and the mortgage as only an accessory and a security.   The doctrine seems to have been borrowed from the civil law.   After the practice grew up of applying to the chancellor to foreclose the right to redeem upon default in the payment of the debt at maturity, it was always an incident of the remedy that the mortgagor should be allowed a specified time for the payment of the debt.   This was fixed by the primary decree, and it might be extended once or oftener, at the discretion of the chancellor, according to the circumstances of the case.   It was only in the event of final default that the foreclosure was made absolute."

And again he said ( pp. 323, 324 ) :

"The settled English practice is for the decree to

order the amount due to be ascertained, and the costs to be taxed, and that upon the payment of both within six months, the plaintiff shall reconvey to the defendant; but in default of payment within the time limited, 'that the said defendant do stand absolutely debarred and foreclosed of and from all equity of redemption of and in said mortgaged premises.' We have been able to find no English case where, in the absence of fraud, a time for redemption was not allowed by the decree. The subject was examined by Chancellor Kent, with his accustomed fullness of research. He came to the conclusion that the time was in the discretion of the chancellor, and to be regulated by the circumstances of the particular case; but he nowhere intimates that such an allowance could be entirely withheld."

The equity of redemption being a creature of the courts of chancery, and impliedly reserved by the mortgagor, notwithstanding any language incorporated into the mortgage, it results that the state legislatures may deal with and regulate it upon equitable principles, and may abate the rigors of the common-law foreclosure in any reasonable way, having due regard to the obligations of the mortgage contract as interpreted by courts of equity. The federal courts of equity first allow six months from the decree of foreclosure in which to redeem, as an incident of the remedy, and this may be extended once or oftener, "at the discretion of the chancellor, according to the circumstances of the case." In some cases—notably in foreclosures upon railways and other extensive properties—the time is extended for years, the subject-matter of the litigation being held in the meantime by receivers appointed upon the same equitable principles as prescribed by our statute hereinbefore cited. Again, such courts refuse to confirm masters' sales where the purchase-price is grossly inadequate, and in cases of peculiar hardship they deny judgment

over, according to the ninety-second equity rule, for any balance due after the application of the proceeds of the mortgaged property in satisfaction of the debt. It is one of the advantages of courts of equity that their remedies are more flexible than those afforded by the common law. In this state, however, the district courts have full equity powers, and yet fore-closures are governed by rules almost inflexible. Personal judgments are rendered for the full amount due, and the proceeds of the mortgaged property are applied only as a credit thereon, so that execution may issue at once for any balance remaining ; and, so far as the reports of this court show, no sheriff's sale has ever been set aside on account of inadequacy of price alone, if, indeed, such a thing can be done. (*Capital Bank v. Huntoon*, 35 Kas. 578, 591, and cases cited.)

In the case cited above from 8 Wall. 318, we have seen that the equity of redemption is regarded by the supreme court of the Union as an estate distinct from the right vested in the mortgagee, and this estate is indefinite in its duration. In accordance with the English rule, the time given in the first instance is at least six months, and then it may be extended "once or oftener, at the discretion of the chancellor." And in granting these extensions according to the circumstances of each case the federal courts of equity have not the remotest idea of "impairing the obligation of contracts." They are endeavoring only to enforce them in a manner dictated by an enlightened system of jurisprudence that seeks not the financial ruin of the mortgagor in the application of his property to the satisfaction of his debt. From causes upon which all do not agree, and that we need not discuss, the burden of a private debt has been enormously increased of late years. Farms valued five years ago

both by borrower and lender at $3,000 or $4,000, and mortgaged for $1,000 are now knocked down under the sheriff's hammer for less than the mortgage debt, the accumulations of a lifetime being often swept away by the shrinkage, and this through no fault of the mortgagor. Now, may not a state legislature take cognizance of such a condition of affairs and prescribe a rule, for application in its courts, regulating the equity of redemption, and even extending it beyond the time formerly allowed? In other words, why may it not, in a time of general depression, reasonably extend the indefinite estate impliedly reserved by the mortgagor, as the federal courts of equity do in particular cases, beyond the six months allowed by the general practice? This reserved estate belongs to the mortgagor, and because of its indefinite duration the legislature ought to have power to regulate it, within reasonable bounds, so as to protect the interests and equities of both debtor and creditor.

Great reliance has been placed by counsel for defendant in error upon the authority of *Bronson v. Kinzie*, supra, and it would be conclusive against our position if a Kansas mortgage of 1885 is to be governed by the rules applicable to the Illinois instrument, of date July 13, 1838, which was enforced in that case. There, in order to secure the payment of a certain bond of $4,000, Kinzie conveyed to Bronson —

"In fee simple, by way of mortgage, one undivided half part of certain houses and lots in the town of Chicago, with the usual proviso that the deed should be null and void if the said principal and interest were duly paid; and Kinzie, among other things, covenanted that, if default should be made in the payment of the principal or interest, or any part thereof, it should be lawful for Bronson, or his repre-

sentatives, to enter upon and sell the mortgaged premises at public auction, and, as attorney of Kinzie and wife, to convey the same to the purchaser, and out of the moneys arising from such sale to retain the amount that might then be due him on the aforesaid bond, with the costs and charges of sale, rendering the overplus, if any, to Kinzie. . . ."

In the opinion the court says ( p. 315):

"As concerns the obligations of the contract upon which this controversy has arisen, they depend upon the laws of Illinois as they stood at the time the mortgage deed was executed. . . .".

And ( p. 318 ) :

"According to the long-settled rules of law and equity in all of the states whose jurisprudence has been modeled upon the principles of the common law, the legal title to the premises in question vested in the complainant, upon the failure of the mortgagor to comply with the conditions contained in the proviso, and at law, he had a right to sue for and recover the land. . . ."

And ( p. 319 ) :

" When this contract was made, no statute had been passed by the state changing the rules of law or equity in relation to a contract of this kind. None such, at least, has been brought to the notice of the court ; and it must, therefore, be governed, and the rights of the parties under it measured, by the rules above stated. They were the laws of Illinois at the time ; and, therefore, entered into the contract, and formed a part of it, without any express stipulation to that effect in the deed."

Thus it appears that, under the laws of Illinois then existing, the mortgage contract was in law what it purported to be on its face — it gave the legal title and the right of possession to the mortgagee on default of payment ; and this no Kansas mortgage has

ever done, whatever may have been its stipulations.
It therefore could not be otherwise than that the laws
of Illinois formed part of the very obligation of the
contract, and the rights vested by its terms with the
sanction of the laws of Illinois could not be divested
by any subsequent law of that state. Where a remedy
is agreed upon in the contract itself, with the sanction
of the state law, the obligation and the remedy are
indistinguishable, and in such case it is entirely
proper to say that the subsisting remedy is a part of
the obligation of the contract. On the other hand,
it is safe to say that the general remedies afforded by
the state jurisprudence and practice, entirely aside
from anything contained in the contract, never con-
stitute any part of its obligation, and may be changed
from time to time ; and this is the doctrine of *Bronson
v. Kinzie*, as quoted in the first reference to the case
in this opinion.

The case of *Howard v. Bugbee*, 24 How. 461, although
from Alabama, is in no way distinguishable from *Bron-
son v. Kinzie*, as will appear from the briefs and the
opinion ; and the authority of the earlier case was, of
course, followed. In Alabama, as well as in Illinois,
the real-estate mortgage was clothed with its common-
law attributes. (*Paulling v. Barron*, 32 Ala. 9, 11; 1
Jones, Mort., § 18.) *Bronson v. Kinzie*, supra, was also
decided in part upon a subsequent law requiring an
appraisement and prohibiting a sale for less than two-
thirds of the appraised value ; and there are other
cases of like nature, but as appraisement laws and
those regulating the equity of redemption depend
upon different principles, it is unnecessary to occupy
time now with their consideration.

It can be no objection to the statute under review
that redemption comes after and not before the sale,

for this is a feature favorable to the creditor.   He may now have the sale advertised as soon as his decree of foreclosure is entered, and he is entitled to the proceeds whenever the sale is confirmed, and this may be at any time afterward that the district court is in session. The new law speeds the sale which is unfettered by any stay or appraisement law.   Neither can it be a valid objection that the mortgagor or his assignee may redeem the property by paying its sale price with interest thereon, for the utmost relief that the courts can afford the creditor as to the mortgaged property is to sell it and apply the proceeds to the payment of the debt.   If any balance remains, the creditor must always look to other property ; and our state laws are as favorable to the creditor in this respect as those of any other state in the Union, and, as we have seen, more favorable than the remedies administered by the federal courts under their practice.

Section 24 of the redemption act in question has been the subject of much criticism.   It relates to the appointment of a receiver under certain circumstances after the sale, and the application of the income up to the execution of the sheriff's deed ; but no question arises under that section in this case, for the record does not show that any receiver was ever appointed or applied for under that section nor under ¶ 4349, General Statutes of 1889.   It would seem that, even if said section should be held invalid, the other sections might yet stand firm.

There is a broad line between this case and *Greenwood v. Butler*, 52 Kas. 424, where the decree of foreclosure had been entered, and the rights of the parties fixed thereby prior to the passage of said chapter 109, Acts of 1893.

If a state legislature may totally abolish imprison-

ment of the debtor as a means of enforcing payment
—if it may shorten the statutes of limitation—if it
may reasonably extend and enlarge exemptions of
property from sale for the payment of debts—if,
where coupons are by law made receivable in payment
of taxes, it may require such payment in the first in-
stance in cash to be afterward refunded and the
coupons taken up—if it may reduce the rate of in-
terest on redemption from decretal sales—if it may
lessen the interest on former judgments—if it may
require the holder of a tax-sale certificate to give
three months' notice of the time when a tax-deed
will be applied for—if it may require transcripts
of judgments against a particular city to be filed
in a certain office as a prerequisite to payment, and
divest the courts of the power to grant remedies
in force when the judgments were rendered—if it may
reduce the terms of court in number and duration—
if it may amend the laws as to attachments, garnish-
ments and receivers so as to take away causes there-
for which were before sufficient—if, in short, ''it
may regulate at pleasure the modes of proceeding''
in the courts, and all this as to existing obligations,
it is difficult to frame a process of reasoning which
would forbid it from so regulating the procedure upon
the foreclosure of mortgages as to define and make
more certain the indefinite estate impliedly reserved
by every mortgagor of real property, and called into
active existence only by the foreclosure, and which
indefinite estate is extended by the federal courts of
equity for six months in the first instance, and after-
ward ''once or oftener,'' in the discretion of the
chancellor, according to the circumstances of the case.
Even if the statute in question should impair the
remedy formerly grantable upon a foreclosure, yet it

should not for this reason be held invalid, for there is no constitutional inhibition against an impairment of the general remedies for the enforcement of broken contracts ; and each and every of the special examples just cited is an instance of the impairment or abolition of a remedy allowable and in force when the obligation was incurred.

Upon the whole, it does not appear that any judgment or decision of the supreme court of the United States requires this court to hold said chapter 109 unconstitutional, whatever may have been remarked by judges in delivering their opinions ; for it is quite impossible to harmonize all that they have said, although the judgments or decisions may not be in conflict. Even doubt of the constitutionality of said chapter is not sufficient to warrant its judicial condemnation, especially by this court. In such case it seems better to leave such condemnation to the final arbiter, the supreme court of the Union.

This opinion is of unusual, perhaps unwarrantable, length ; but the question involved is so important, and the respect of the writer for the deliberate judgment of his predecessor and the associate justice who concurred with him so profound, that it has been deemed best to state fully the reasons which lead to a different conclusion from that reached by the former majority of the court.

The motion for a rehearing will be granted, the judgment of the district court overruling the motion of plaintiff in error for the issue of a certificate of sale instead of a deed will be reversed, and the cause remanded for further proceedings in accordance with this opinion.

ALLEN, J., concurring.

A. T. & S. F. Rld. Co. v. Hughes.

JOHNSTON, J.: This case, together with *Watkins v. Glenn*, ante p. 417, (40 Pac. Rep. 316,) was submitted upon ample briefs and oral argument at the March, 1895, session, and after a full consideration, a decision was reached in April following, when it was determined by a majority of the court that the redemption law has no retroactive operation, and therefore does not apply to mortgage contracts existing at and before its passage, and that, if the legislature intended the act to apply to such contracts, it would violate § 10 of article 1 of the federal constitution. The judgment of the court was pronounced by Chief Justice HORTON, and I am still satisfied with the views then expressed. The opinion delivered by Chief Justice HORTON embodies a careful review of the authorities, and such a clear and forcible exposition of the law, that I am satisfied no additional force could be added by any further comments that I might make. I refer to that opinion for the grounds of my dissent to the allowance of a rehearing, and to the judgment of reversal.